Evelyn V. Keyes, Justice *722 A jury convicted appellant, Joseph Gibbs, of the offense of capital murder.[1] Because the State did not seek the death penalty, the trial court automatically assessed appellant's punishment at confinement for life without parole. In three issues, appellant contends: (1) the trial court erroneously allowed testimony that a witness knew appellant prior to the charged offense from having sold him drugs, in violation of Rules of Evidence 403 and 404(b); (2) the trial court erroneously admitted recordings of two interrogations because appellant's statements were the result of coercion and were not made voluntarily; and (3) the State failed to present legally and factually sufficient evidence that appellant committed the offense.
We affirm.
Background
A. Factual Background
In July 2010, Ashley Broussard was twenty-one years old and living with a friend of hers, Willie Narcisse, in Baytown, Texas. Willie's cousin, Valencia Narcisse, who was fifteen years old at the time, also lived with them, and Valencia and Ashley were friends. Valencia and Ashley were the two complainants in the charged offense.
Tyrone Gilbert was also related to Willie and Valencia Narcisse and was friends with Ashley Broussard. He lived with his sister in the Trestles apartment complex in Baytown. Gilbert admitted that he sold drugs out of his apartment, and he stated that he stored drugs in a kitchen cabinet above the sink and in the master bedroom. Gilbert testified that he knew appellant as "Joe" and "N.O.," which referenced the fact that appellant was from New Orleans, and that he sold cocaine to appellant about every other day.[2] Gilbert would invite appellant inside the apartment during their drug transactions, and appellant would stand in the kitchen while Gilbert retrieved the drugs.
On the evening of July 10, 2010, Ashley and Valencia had planned to go to a party together, but the water had been shut off at Willie Narcisse's apartment, where they were living. Gilbert picked Ashley and Valencia up from Willie's apartment and drove them back to his apartment so they could each take a shower and get ready for the party. Gilbert testified that he dropped the girls off, took some of the drugs he had stored in the apartment, and left to sell drugs elsewhere around the apartment complex. Valencia testified that Gilbert stayed at the apartment for around twenty to thirty minutes before he left, leaving Ashley and her alone in the apartment.
After the girls had gotten ready for the party, Ashley walked into the master bedroom and called another friend of theirs, informing their friend that they were ready to head over to the party. While Ashley was on the phone, Valencia heard a knock at the front door of the apartment. When she opened the door, she saw appellant, whom she had never met or seen *723 before. Valencia identified appellant in court as the person who appeared at the front door of Gilbert's apartment. Appellant asked Valencia if he could use her cell phone to call Gilbert. Valencia refused to give appellant her phone, and she started to close the front door, but appellant stopped her from doing so and "barged in" while holding a gun to Valencia's face.
Appellant grabbed Valencia's phone from her hands and ordered both Ashley and her to get on their knees. Valencia was in the doorway to the master bedroom, facing the dining room and kitchen, and Ashley was behind her inside the master bedroom. At the time, Valencia did not believe that appellant would shoot them; instead, she thought that he was "just going to take what he wanted and he was going to leave." After Valencia and Ashley got on their knees, appellant went "straight to the kitchen" and started going through the cabinets and the drawers. He asked Valencia "where was the money," and, after she was unable to answer him, he shot her in the head.
Valencia lost consciousness immediately after being shot, but she regained consciousness "after a while" and was able to stand up and walk around. The front door to the apartment was wide open, and Valencia "tried to go downstairs to look for help." She saw two men standing downstairs, but she did not know who they were, so she went back upstairs and sat on the couch in the living room. Valencia was bleeding heavily and she could not talk. At some point, Gilbert arrived back at the apartment, and shortly thereafter Valencia's brother, McThaniel Narcisse, arrived and took her to the hospital. Valencia spent two days in the intensive care unit and another day and a half in the hospital before she was released. She had a fractured skull and suffered from a speech problem and nightmares after the shooting.
Gilbert testified that he was only away from the apartment for about fifteen minutes. When he came back, he saw a trail of blood on the cement of the stairs leading up to his apartment. He went upstairs and saw that the front door to the apartment was open. When he went inside, he saw Valencia, who was standing in the living room and who had blood on her forehead. Valencia was making sounds, but she was unable to speak. Gilbert went into the master bedroom and found Ashley lying on the floor. Ashley was still breathing and still had a pulse, but she was not responsive. Because of his drug-dealing activities, Gilbert did not want to use his phone to call 9-1-1, so he ran to a neighbor's apartment and asked them to call 9-1-1. Gilbert also called McThaniel, who arrived before the police did and took Valencia to the hospital. Gilbert searched the kitchen for his drugs but did not find any. He took the drugs stored in the master bedroom to a nearby apartment before the police could arrive and enter the apartment.
When Baytown Police Department officers arrived at the apartment around 11:15 p.m., they discovered Ashley lying face-down on the floor of the master bedroom. Ashley was still breathing at the time, but there was a pool of blood around her head and she could neither move nor talk. Ashley was taken by Life Flight to a hospital in Houston, but she passed away at the hospital. Dr. Darshan Phatak, an assistant medical examiner with the Harris County Institute of Forensic Sciences, conducted Ashley's autopsy. He determined that Ashley died from a single gunshot wound to the left side of her head.
B. The Police Investigation
Baytown Police Department Officer J. Gonzalez was one of the first officers at *724 the scene of the shooting. After he helped secure the scene, Officer Gonzalez received information that Valencia had arrived at a local hospital in Baytown. At the hospital, Officer Gonzalez had a conversation with McThaniel Narcisse, who told Gonzalez about what had happened at the apartment. Officer Gonzalez passed that information along to the detectives that were investigating the shooting.
Baytown Police Department Detective G. Gonzalez investigated the shooting and spoke with several people, including Gilbert, McThaniel Narcisse, and the friend that Ashley had been speaking to on the phone when the shooting occurred. Through these interviews, Detective Gonzalez developed a suspect, "Joe out of New Orleans," who was a "skinny black male with some dread[locks] or braids." Detective Gonzalez spoke with several people at nearby apartment complexes concerning who "Joe from New Orleans" might be, and he obtained appellant's name. Detective Gonzalez was unable to locate appellant, so he broadcast appellant's name and physical description to other Baytown police officers.
Valencia spoke with the police while she was still in the hospital. She informed the detectives that appellant-whose name she did not know-had been wearing a red shirt and that he had "little twists" in his hair, indicating that he had been starting to grow out dreadlocks. Detectives showed Valencia a photo-array containing appellant's picture on two occasions: once while she was still in the hospital and again two months later. On both occasions Valencia identified appellant as the person who had shot her.
Two days after the shooting of Ashley and Valencia, Baytown police officers received a dispatch that a suspect-appellant-had been seen in a particular area. Assistant Chief M. Holden was driving on a street near the Trestles Apartments when he saw appellant walking toward him, wearing a red shirt and black pants. He had a shaved head but otherwise matched the physical description given in the dispatch. Appellant gave Assistant Chief Holden a false name and stated that he was from New Orleans. Appellant eventually provided his true name, which had been included in the dispatch Assistant Chief Holden received. Detective Gonzalez testified that when appellant was arrested, "it appeared he had shaved his head, but he still had patches of hair on his head," as though he had not "do[ne] a good shave."
C. Appellant's Custodial Interrogations
Appellant spoke with Baytown police officers on multiple occasions after his arrest. The first and second conversations involved appellant, Detective Gonzalez, and another Baytown Police Department detective, Detective Elizondo. The third conversation involved appellant, the detectives, Kari Allen, a Harris County assistant district attorney, and appellant's mother. The first conversation occurred on July 12, 2010, and the second and third conversations occurred nearly twenty-four hours later on July 13, 2010.
Appellant filed a pre-trial motion to suppress the video recordings of the first and second conversations with the officers and the audio recording of the third conversation. His primary argument in support of suppressing the statements was that, in addition to the shooting of Ashley and Valencia, appellant had also been implicated in a shooting that occurred at a dice game ("the dice game shooting") shortly before the charged offense, as well as in another shooting that had occurred after the charged offense. In the custodial interviews, the detectives discussed all of these shootings, but focused mainly on the dice game shooting. Appellant sought suppression *725 of the interviews due to the discussion of this extraneous offense that was not related to the charged offense.
At the suppression hearing, the trial court reviewed transcripts of the three conversations appellant had with police officers, as well as unredacted recordings of the conversations. The State agreed that, because the first conversation primarily concerned the dice game shooting, and only briefly mentioned the charged offense of the shooting of Ashley and Valencia, it would not offer the recording of that conversation into evidence. The trial court agreed and excluded this recording in its entirety.
Appellant also argued that a portion of the first conversation rendered the second and third conversations involuntary and the product of coercion. During the discussion of the dice game shooting in the first conversation, appellant admitted that he was present at the dice game, but he tried to place blame for that shooting on a man named "Stank," who had apparently also shot someone in New Orleans. Detectives Gonzalez and Elizondo did not believe appellant, and they told him on several occasions that they did not believe that Stank existed and that, if he did, he was not at the dice game because witnesses had told them who was present at that game.
The detectives and appellant had the following exchange:
Elizondo: So if I sit him [Stank] down right next to you, are you going to tell him what you're telling us? That he's the one that's been doing all the shootings, am I right? We've got guys ready to go get him right now, because of what you told us. We've got three detectives going to go get him right now. We're going to put him right here next to you and you're doing to tell him again what you told us.
Appellant: [Inaudible]
Gonzalez: The what ...? Brother, right now if we release you-like I told you earlier-you're dead.
....
Gonzalez: And you know what? You know what's funny? Is that dude, that's another lie you have because he wasn't there. But we're going to bring him in anyways because he's a big motherfucker, he'll probably whoop your ass in here because he wasn't there. And you know what? I know he wasn't because he was with me at another place. That's how I know that son of a bitch. He's a big dude, right? He's a big son of a bitch; just got out of prison.
....
Elizondo: I feel bad for you, man.
Gonzalez: I feel bad for you, though.
Elizondo: You're going to get the needle here in Texas. You don't show remorse, man; that's what sucks.
Gonzalez: Yeah, that's what bad.
The first conversation ended immediately after this exchange. Defense counsel argued that the detectives threatened appellant by saying they were going to bring Stank into the interrogation room and that, despite appellant's receiving the Miranda warnings again at the beginning of the second conversation that occurred the next day, the detectives' statements were coercive and rendered appellant's later statements involuntary. The trial court overruled defense counsel's objection on that basis.
The trial court also reviewed the transcripts of appellant's second and third conversations and required the State to redact any references to the dice game shooting and the shooting that occurred after the charged offense. The State did so, and the trial court admitted redacted versions of these conversations. At the beginning of *726 the second conversation, appellant, who was crying off and on throughout the start of the conversation, consented to a waiver of the Miranda rights and then consented to provide a saliva sample. Appellant admitted to knowing that McThaniel and "the little girls" are all from Louisiana, that McThaniel is "selling powder," and that Gilbert works for McThaniel. Appellant admitted being inside Gilbert's apartment once "to get some powder" from Gilbert a day or two before the shooting. Appellant denied being involved in the shooting, stating, "why would I kill some girls for nothing? This ain't my shit, man." Appellant admitted that he had had a gun in the past that he later sold, but he stated that he did not own a gun at the time of the shooting. The detectives confronted appellant with the fact that he changed his appearance after the shooting because he "knew [the police] were out there" looking for him. Appellant then indicated that he wanted to talk to the district attorney in a recorded conversation, and the interview ended.
In the third conversation, which began less than twenty minutes after the second conversation, appellant stated that he "want[ed] the death penalty" and that he would "wrap up y'all's case for y'all; everything." Allen, an assistant district attorney, assured appellant that she could not make any promises to appellant about what would happen with the case, but they would "take into consideration everything that [he was] saying." Appellant repeatedly stated his desire for a "guarantee" that he would get the death penalty "in a timely fashion," and the detectives and Allen repeatedly told him that they could not give him a guarantee and that appellant needed to tell them what happened with regard to the offense before any decisions could be made. Detective Gonzalez asked appellant where he could find the gun that was used because he did not want anyone else to "grab that thing," and appellant responded, "They ain't going to find it, man."
The following occurred during the third conversation:
Gonzalez: Alright, well I'll tell you what, since we have her [Allen] on the phone and we're still talking-at what point did you go into that apartment?
Appellant: I ain't ... never went in no apartment.
Gonzalez: Yeah, that's where that little girl-that's where that little girl saw you.
Appellant: Nuh-uh, I know what you're trying to do.
Gonzalez: No, I'm telling you-
Appellant: Man, I ain't did nothing.
Gonzalez: Okay.
Appellant: I ain't did nothing.
He later stated, "I can tell you this, I didn't pull the trigger." Appellant did not give the detectives any details about the charged offense. He requested to speak with his mother with the recording running, and Allen agreed to call her.
Appellant sought his mother's advice about what he should do, and the detectives encouraged him to tell his mother "what he did." Appellant had the following exchange with his mother:
Appellant: Ma, I'm trying-I'm trying-I'm trying to see-I'm trying to see if they can give me the death penalty.
Ms. Gibbs: You what?
Appellant: The death penalty.
Ms. Gibbs: You're trying to see if they're going to give you the death penalty?
Appellant: Yeah, that's what I want.
Ms. Gibbs: What's wrong with you, man? What's wrong with you, baby?
Appellant: Ma, I fucked up.
Ms. Gibbs: Damn, baby.
*727 Appellant: Ma, I fucked up bad.
Ms. Gibbs: Oh, they going to know you said that.
Appellant: I fucked up. Ma, I fucked up bad, Ma.
After speaking with his mother, appellant did not admit to shooting Ashley and Valencia, and he refused to provide any details about his involvement in the charged offense, stating, "I'm going to wait till my court date is due."
The trial court issued findings of fact and conclusions of law concerning the admissibility of the three conversations. With respect to the first conversation, which the court excluded in its entirety, the trial court found that the detectives read appellant the Miranda warnings and appellant voluntarily waived his rights. The trial court made findings concerning what the detectives told appellant about bringing Stank into the interview room, and the court found, "At no time did either of the detectives threaten [appellant], make any promises or offer any inducement of any kind to him, or physically abuse or mistreat him." With respect to the second conversation, which occurred on the next day, the trial court found that appellant "reinitiated communication by indicating he wanted to talk again" and that appellant again voluntarily waived his Miranda rights. The trial court also found that, during this conversation, appellant "voluntarily, unprovoked, and under no duress, coercion, or threats" informed the detectives that he wanted to speak with the district attorney. The court found that, throughout the second and third conversations, appellant voluntarily made statements such as, "I'll give y'all everything," "I didn't mean for none of this to happen," "They ain't going to find [the gun] man," "I didn't pull the trigger," and "I fucked up."
The trial court concluded that in all three interviews appellant knowingly and voluntarily waived his Miranda rights. The court also concluded that appellant voluntarily spoke with detectives concerning Ashley's murder and other extraneous offenses "in the absence of any threats, promises, coercion, or other improper inducement on the part of any of the detectives." The court further concluded that appellant terminated the first interview, which was honored by the detectives, and then reinitiated communication with the detectives.
The jury ultimately found appellant guilty of the offense of capital murder. Because the State did not seek the death penalty, the trial court automatically assessed appellant's punishment at confinement for life without parole. This appeal followed.
Sufficiency of the Evidence
In his third issue, appellant contends that the State failed to present legally and factually sufficient evidence that he committed the offense of capital murder. We address this issue first.
A. Standard of Review
When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) ; Griffin v. State , 491 S.W.3d 771, 774 (Tex. Crim. App. 2016). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. Bartlett v. State , 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). The jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any *728 part of a witness's testimony. See Sharp v. State , 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) ; Rivera v. State , 507 S.W.3d 844, 853-54 (Tex. App.-Houston [1st Dist.] 2016, pet. ref'd).
We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. Williams v. State , 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) ; Leroy v. State , 512 S.W.3d 540, 543 (Tex. App.-Houston [1st Dist.] 2016, no pet.). We give great deference to the jury's credibility determinations. Gardner v. State , 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). We resolve any inconsistencies in the evidence in favor of the verdict. Curry v. State , 30 S.W.3d 394, 406 (Tex. Crim. App. 2000) ; see also Murray v. State , 457 S.W.3d 446, 448-49 (Tex. Crim. App. 2015) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination."). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. Temple v. State , 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (quoting Hooper v. State , 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) ). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." Hooper , 214 S.W.3d at 13.
B. Capital Murder
To prove that appellant committed the offense of capital murder, as charged in the indictment, the State was required to establish that appellant, while in the course of committing or attempting to commit either the robbery of Valencia Narcisse or the burglary of a building owned by Valencia, intentionally caused the death of Ashley Broussard by shooting her with a firearm. See TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2017). The only element of the offense that appellant challenges on appeal is his identity as the person who shot Ashley.
The State may prove identity by "either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence." Gardner , 306 S.W.3d at 285. Identity may be established by the testimony of a single eyewitness. Pitte v. State , 102 S.W.3d 786, 794 (Tex. App.-Texarkana 2003, no pet.) ; see also Shah v. State , 414 S.W.3d 808, 812 (Tex. App.-Houston [1st Dist.] 2013, pet. ref'd) ("It is well-established that the testimony of a sole witness to an offense may constitute legally sufficient evidence to support a conviction.").
Valencia, the only witness who survived the shooting, testified that she and Ashley were getting ready for a party in Gilbert's apartment when Valencia heard a knock at the front door. She opened the door and saw appellant. Appellant asked to use her cell phone to call Gilbert, and when Valencia refused, appellant forced his way into the apartment and grabbed her phone. She testified that appellant held a gun to her face and ordered both Ashley and her to get on their knees. Appellant went into the kitchen and began looking through cabinets, demanding to know where money was located. Appellant then shot Valencia in the head. When she regained consciousness, appellant had left the apartment and Ashley had also been shot in the head. Valencia twice identified appellant as the shooter in a photo array-once two days after the shooting when she was still in the hospital and then again two months later-and she identified appellant as the shooter in court. Valencia's in-court identification of appellant was unequivocal.
*729 In addition to Valencia's eyewitness testimony, other evidence linked appellant to this offense. Gilbert testified that appellant had purchased drugs from him in the past, that appellant had purchased drugs from Gilbert at the apartment where the shooting took place, and that appellant had seen that Gilbert kept a portion of his drug supply in the kitchen cabinets. When appellant was arrested after the shooting, he was wearing clothes that matched the description that Valencia had provided to officers. Valencia had also told officers that appellant had "little twists" in his hair, as though he were trying to grow out dreadlocks. When officers arrested appellant, it appeared that he had recently shaved his head, but he had done a poor job and had left patches of hair on his head. Appellant admitted during the second conversation he had with Baytown Police Department detectives that he knew Gilbert, that he had purchased drugs from Gilbert before, and that he had been in Gilbert's apartment, although he told the detectives that the last time he was at the apartment was a day or two before the shooting.
Appellant contends that the evidence was insufficient to support his conviction, arguing that Valencia's identification of him as the shooter was flawed in several respects. He points out that Valencia testified she had never seen appellant before, she stated that the living room of the apartment was dimly lit, and she lost consciousness after being shot. He also argues that the photo array that Valencia viewed in the hospital-and then again two months later-was "highly suggestive" because the background of appellant's picture in the photo array was blue, while the backgrounds of the other pictures in the array were beige, and appellant was thinner and had a lighter complexion than the other men in the photo array.
Valencia testified that, when appellant entered the apartment, the kitchen light was on, and she stated that there was enough light in the apartment that she could see what the intruder looked like. When asked if there was anything else-aside from the clothing and the hair-about the intruder's appearance that stood out to her, Valencia responded, "his eyes," and she stated, "I looked into his eyes while he had the gun in my face." She stated that when she viewed the photo array, appellant's eyes stood out to her.
The jury had before it Valencia's unequivocal eyewitness testimony identifying appellant as the person who forced his way into Gilbert's apartment, rifled through the kitchen cabinets purportedly looking for money, and shot both Ashley and her. See Shah , 414 S.W.3d at 812 (holding that testimony of sole eyewitness may constitute sufficient evidence to support conviction). The jury also had before it evidence that lighting in the apartment was dim and that the photo of appellant used in the photo array shown to Valencia was different in several respects from the other photos in the array. The jury weighed the evidence and found Valencia's identification of appellant credible. It was within the province of the jury, as the fact finder, to weigh and evaluate the credibility of the evidence, and we will not substitute our judgment on appeal for that of the jury. See Williams , 235 S.W.3d at 750 ; Leroy , 512 S.W.3d at 543.
We conclude that, viewing the evidence in the light most favorable to the verdict, as we must when conducting a review of the sufficiency of the evidence, a rational fact finder could have found beyond a reasonable doubt that appellant, in the course of robbing or attempting to rob Valencia, caused the death of Ashley by shooting her *730 with a firearm. See TEX. PENAL CODE ANN. § 19.03(a)(2) ; Griffin , 491 S.W.3d at 774.
We overrule appellant's third issue.[3]
Admission of Extraneous Offense Evidence
In his first issue, appellant contends that the trial court erred by admitting Gilbert's testimony that he knew appellant because he had sold drugs to appellant in the past. Specifically, appellant argues that this testimony constituted inadmissible evidence of an extraneous offense, and the prejudicial effect of the evidence substantially outweighed its probative value.
A. Standard of Review and Governing Law
We review a trial court's decision to admit or exclude evidence for an abuse of discretion. Henley v. State , 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016). A trial court abuses its discretion only when the court's decision was so clearly wrong as to lie outside the zone within which reasonable persons might disagree. Id. at 83 (quoting Taylor v. State , 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) ); Binnion v. State , 527 S.W.3d 536, 545 (Tex. App.-Houston [1st Dist.] 2017, pet. ref'd).
Relevant evidence-that is, evidence that has a tendency to make a fact of consequence more or less probable-is admissible unless provided otherwise by law. TEX. R. EVID. 401, 402. Generally, evidence of a prior extraneous offense is not admissible to prove a person's character in order to show that, on a particular occasion, the person acted in conformity with that character. TEX. R. EVID. 404(b)(1). However, extraneous offense evidence may be admissible for a purpose other than character conformity, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2). Evidence demonstrating that the accused has a motive for committing the offense is admissible "if it is relevant as a circumstance tending to prove the commission of the offense." Gosch v. State , 829 S.W.2d 775, 783 (Tex. Crim. App. 1991) ; Crane v. State , 786 S.W.2d 338, 350 (Tex. Crim. App. 1990) ("[T]he prosecution may always offer evidence to show motive for the commission of an offense because it is relevant as a circumstance to prove the commission of the offense.") (quoting Porter v. State , 623 S.W.2d 374, 385-86 (Tex. Crim. App. 1981) ); Lopez v. State , 200 S.W.3d 246, 251 (Tex. App.-Houston [14th Dist.] 2006, pet. ref'd) ("Evidence showing motive to commit murder is a significant circumstance indicating guilt, and it is therefore relevant and admissible.").
" Rule 404(b) is a rule of inclusion rather than exclusion," and the rule "excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." De La Paz v. State , 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). The proponent of extraneous offense evidence must be able to *731 explain to the trial court "the logical and legal rationales that support its admission on a basis other than 'bad character' or propensity purpose." Id.
Rule of Evidence 403 provides that a trial court may exclude otherwise relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, causing undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403. When conducting a Rule 403 analysis, the trial court must balance:
(1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.
Gigliobianco v. State , 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006) ; see Davis v. State , 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (stating that "probative value" refers to "inherent probative force of an item of evidence-that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation-coupled with the proponent's need for that item of evidence" and that "unfair prejudice" refers to "a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"). Rule 403 favors the admission of relevant evidence, and we presume that relevant evidence will be more probative than prejudicial. Shuffield v. State , 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). We review a trial court's ruling under Rule 403 for an abuse of discretion. Pawlak v. State , 420 S.W.3d 807, 810 (Tex. Crim. App. 2013) ; see De La Paz , 279 S.W.3d at 344 (stating that ruling admitting extraneous offense evidence is generally within zone of reasonable disagreement if evidence is "relevant to a material, non-propensity issue" and probative value of evidence "is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury").
B. Analysis
The State argued, in the trial court and on appeal, that Gilbert's testimony concerning his prior drug transactions with appellant was admissible because it was relevant to show appellant's motive for forcing his way into Gilbert's apartment on the night of the shooting. We agree.
Gilbert testified that he was acquainted with appellant and that he would usually see appellant once or twice per day. He testified, over appellant's objection, that he would see appellant several times a day because appellant would buy cocaine from him. Gilbert testified that he often conducted drug transactions inside his apartment and that appellant had been invited inside the apartment for the purpose of drug sales. Gilbert also testified that he kept some of his drugs for sale in a kitchen cabinet above the sink and that appellant had been in the kitchen with him when Gilbert was handling drugs.
Valencia testified that, on the night of the shooting, appellant arrived at the apartment asking for a cell phone so he could call Gilbert. When Valencia refused to provide her phone, appellant forced his way into the apartment, pointed a gun at Valencia and told Ashley and her to get on their knees. Appellant then went into the kitchen and began searching through the cabinets while demanding to know "where *732 the money was." When he was unable to find what he sought, he shot both Valencia and Ashley in the head and fled the apartment. Gilbert's testimony that he had previously sold appellant cocaine, that appellant had purchased the drugs at Gilbert's apartment, and that appellant had seen that Gilbert stored drugs in a kitchen cabinet connected appellant to the scene of the shooting and provided an explanation for appellant's actions. This evidence was relevant to establish motive, and it made appellant's identity as the shooter more probable. See TEX. R. EVID. 401. Because Gilbert's testimony has relevance apart from evidence of appellant's bad character, the trial court did not abuse its discretion by allowing Gilbert's testimony under Rule 404(b). See TEX. R. EVID. 404(b)(2) ; De La Paz , 279 S.W.3d at 343.
With respect to appellant's Rule 403 challenge, Gilbert's testimony provided a critical link between appellant and the shooting of Valencia and Ashley. As appellant pointed out at trial, no forensic evidence connected him to the scene of the shooting, and the detectives never recovered the weapon used, so no ballistics comparisons could be made to the bullet fragments recovered during Ashley's autopsy. The probative force of the testimony was strong, as it tended to make appellant's identity as the shooter more probable than if the State had to rely solely on Valencia's eyewitness identification without the context of the connection between appellant and Gilbert and the explanation for why appellant would be searching cabinets in Gilbert's kitchen. Furthermore, Gilbert's testimony concerning appellant's history of purchasing drugs from him was brief-taking up only two pages of the reporter's record-and was not the focus of his testimony, which instead centered on Gilbert's actions on the night of the shooting and his discovery of Valencia and Ashley after the shooting had occurred. Given the more serious nature of the charged offense of robbing Valencia and causing Ashley's death relative to the extraneous bad act of having previously purchased drugs from Gilbert, we cannot say that Gilbert's testimony was likely to cause the jury to make its decision on an improper basis. See Davis , 329 S.W.3d at 806 (stating that "unfair prejudice" refers to "a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one").
We therefore conclude that the trial court did not abuse its discretion by determining that the prejudicial effect of Gilbert's testimony did not substantially outweigh the probative value of the testimony. See TEX. R. EVID. 403.
We overrule appellant's first issue.
Admission of Interrogations
In his second issue, appellant contends that the trial court erred in denying his motion to suppress his second and third conversations with the investigating detectives. Appellant argues that these conversations should have been suppressed in their entirety because they were made as a result of coercion and were not made voluntarily. He also argues that the conversations should have been suppressed in their entirety because, even with the redactions ordered by the trial court, the conversations still primarily related to the dice game shooting, and appellant did not knowingly and voluntarily speak with the detectives concerning the charged offense.
A. Standard of Review
We review a trial court's denial of a motion to suppress for an abuse of discretion and apply a bifurcated standard of review. Furr v. State , 499 S.W.3d 872, 877 (Tex. Crim. App. 2016). We afford almost complete deference to the trial *733 court's determination of historical facts, especially the court's determinations that are based on the assessment of credibility and demeanor. Id. ; Crain v. State , 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). We conduct a de novo review of mixed questions of law and fact that do not hinge on determinations of credibility or demeanor. Brodnex v. State , 485 S.W.3d 432, 436 (Tex. Crim. App. 2016) ; see also Johnson v. State , 414 S.W.3d 184, 192 (Tex. Crim. App. 2013) (stating that application of legal principles to specific set of facts is issue of law that we review de novo). When, as here, the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports the fact findings. Johnson , 414 S.W.3d at 192. We will sustain the trial court's ruling if it is correct under any applicable theory of law. Furr , 499 S.W.3d at 877 ; Arguellez v. State , 409 S.W.3d 657, 662-63 (Tex. Crim. App. 2013).
Code of Criminal Procedure article 38.21 provides that an accused's statement "may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). Article 38.22 sets out when an accused's oral or written statements made as a result of custodial interrogation may be used in evidence. Id. art. 38.22 (West 2018). An accused's written statement may not be admissible unless it is shown on the face of the statement that the accused, prior to making the statement, received a warning that:
(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
(2) any statement he makes may be used as evidence against him in court;
(3) he has the right to have a lawyer present to advise him prior to and during any questioning;
(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
(5) he has the right to terminate the interview at any time.
Id. art. 38.22, Sec. 2(a). The face of the written statement must indicate that, prior to making the statement, the accused knowingly, intelligently, and voluntarily waived the rights set out in the above warnings. Id. art. 38.22, Sec. 2(b). For a recording of an oral statement to be admissible, among other requirements, the accused must have been given the above warnings and he must have knowingly, intelligently, and voluntarily waived any rights set out in the warnings. Id. art. 38.22, Sec. 3(a). In situations in which the accused raises a question concerning the voluntariness of his statement, the trial court must make an independent finding outside the presence of the jury "as to whether the statement was made under voluntary conditions." Id. art. 38.22, Sec. 6.
A criminal defendant may argue that his statement was not freely and voluntarily made-and, therefore, not admissible as evidence-under several theories: (1) article 38.22, section 6, concerning "general voluntariness"; (2) Miranda v. Arizona , as expanded by article 38.22, sections 2 and 3; or (3) the Due Process Clause. Oursbourn v. State , 259 S.W.3d 159, 169 (Tex. Crim. App. 2008) ; see Miranda v. Arizona , 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (holding that statements of accused that are products of custodial interrogation may not be used unless, prior to questioning, *734 accused is warned of certain rights and accused waives those rights, knowingly, intelligently, and voluntarily).
An accused's confession is involuntary under the Due Process Clause "only when there is police overreaching." Oursbourn , 259 S.W.3d at 169 ; see Colorado v. Connelly , 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) (holding that "coercive police activity" is "necessary predicate" to finding that confession is involuntary under due process clause). "A statement is 'involuntary' for the purposes of federal due process, only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." Alvarado v. State , 912 S.W.2d 199, 211 (Tex. Crim. App. 1995) ; Mason v. State , 116 S.W.3d 248, 257 (Tex. App.-Houston [14th Dist.] 2003, pet. ref'd) ("The test is whether the defendant's will was 'overborne' by police coercion."). When determining whether an accused knowingly, intelligently, and voluntarily waived his Miranda rights we consider:
First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
Joseph v. State , 309 S.W.3d 20, 25 (Tex. Crim. App. 2010) (quoting Moran v. Burbine , 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) ); see Connelly , 479 U.S. at 170, 107 S.Ct. at 523 (" Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that."). Voluntariness of a defendant's statement is determined by considering "the totality of the circumstances under which the statement was obtained." Creager v. State , 952 S.W.2d 852, 855 (Tex. Crim. App. 1997) ; Mason , 116 S.W.3d at 257.
B. Analysis
1. Whether appellant voluntarily spoke about charged offense
In challenging the voluntariness of his statements and in arguing that the second and third conversations should have been suppressed in their entirety, appellant first argues that, even though the recordings of the second and third conversations were redacted to remove references to the dice game shooting, the conversations still "mainly related" to that shooting instead of the charged offense of the shooting of Valencia and Ashley. Appellant argues that he did not knowingly or voluntarily speak with the detectives about the charged offense.
Although the first interview, which was suppressed by the trial court, primarily concerned appellant's involvement in the dice game shooting, the detectives also mentioned, on multiple occasions during the interview, that appellant was potentially facing several charges and that several people had been shot. The detectives did not mention Ashley or Valencia by name, but at one point Detective Elizondo told appellant, "That little girl right there, she's dead. There's another girl that's alive and she's talking, barely but she's talking," and at another point he stated, "Those little girls were at the wrong place at the wrong time, brother. They weren't even supposed to be at that apartment." Appellant *735 made statements throughout the first interview indicating that he was aware that multiple victims were involved. The second conversation also focused on the dice game shooting, but appellant referenced "[McThaniel Narcisse and] the little girls," he mentioned purchasing "powder" from Gilbert, and he stated, "This ain't my type of shit. Why would I kill some girls for nothing?" No evidence supports appellant's assertion that he was unaware that he was answering questions concerning the shooting of Ashley and Valencia because he instead believed "the detectives were concerned with the shooting that occurred at the dice game."
Moreover, the detectives read appellant his Miranda rights at the start of both the first and second conversations, and this included the warning that "[a]ny statement you make may be used as evidence against you in court." Appellant indicated that he understood this right and that he wished to speak with the detectives anyway. The Court of Criminal Appeals, following the United States Supreme Court, has held that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." Leza v. State , 351 S.W.3d 344, 350 (Tex. Crim. App. 2011) (quoting Colorado v. Spring , 479 U.S. 564, 577, 107 S.Ct. 851, 859, 93 L.Ed.2d 954 (1987) ). Thus, even if the detectives had not informed appellant, prior to reading him the Miranda warnings, that the detectives would discuss the charged offense in addition to the dice game shooting during the interrogation, this alone "is patently insufficient, as a matter of law, to render [appellant's] waiver of Miranda rights either involuntary or insufficiently informed." See id. ; see Spring , 479 U.S. at 577, 107 S.Ct. at 859 ("This Court's holding in Miranda specifically required that the police inform a criminal suspect that he has the right to remain silent and that anything he says may be used against him. There is no qualification of this broad and explicit warning.") (emphasis in original); Murphy v. State , 100 S.W.3d 317, 322 (Tex. App.-San Antonio 2002, pet. ref'd) (stating that it is "not critical that a suspect know the charges to which he is susceptible" because "[s]o long as the suspect understands the basic principles that he has the right to remain silent and whatever he says can be used as evidence against him, his waiver is constitutionally adequate").
We conclude that appellant's second and third conversations with the detectives were not involuntary on the basis that appellant was unaware that he was answering questions related to the charged offense or failed to understand his rights.
2. Whether conversations were result of police coercion
Appellant also argues that his statements during the second and third conversations were not voluntarily made because, at the end of the first conversation, the detectives threatened to bring Stank into the interrogation room and he might "whoop" appellant, and the detectives told appellant that he was going to "get the needle," referring to the death penalty. Appellant argues that the detectives made these statements to frighten him into speaking with them again and that, as a result of these statements, appellant did not voluntarily waive his Miranda rights at the start of the second conversation.
At the beginning of the first conversation, primarily concerning the dice game shooting, appellant indicated his willingness to cooperate with the detectives if they could promise him protection from a man who had frequently been incarcerated *736 in Texas and was "high ranking in a gang." Appellant identified this individual as a man called "Stank," and he told the detectives that while he was present at the dice game shooting, Stank was the shooter, and he described what happened. The detectives did not believe appellant's version of events, telling him that witnesses had identified him as the shooter. The detectives pleaded with appellant to tell them the truth, and Detective Elizondo stated, "you're in Texas, not New Orleans, man. In Texas, man, you will get the needle, okay, no joke, man." The detectives also expressed doubt that Stank actually existed, stating, "There's no Skank, or whatever the hell you're calling this guy, Stank, Skank-there's no guy like that. I already know everybody who's playing dice." Detective Elizondo also stated, "Did you see Stank shoot this dude right here in this picture I showed you? You didn't see him because there's no Stank."
At the end of the first interview, the detectives and appellant had the following exchange:
Elizondo: So if I sit him [Stank] down right next to you, are you going to tell him what you're telling us? That he's the one that's been doing all the shootings, am I right? We've got guys ready to go get him right now, because of what you told us. We've got three detectives going to go get him right now. We're going to put him right here next to you and you're doing to tell him again what you told us.
Appellant: [Inaudible]
Gonzalez: The what ...? Brother, right now if we release you-like I told you earlier-you're dead.
....
Gonzalez: And you know what? You know what's funny? Is that dude, that's another lie you have because he wasn't there. But we're going to bring him in anyways because he's a big motherfucker, he'll probably whoop your ass in here because he wasn't there. And you know what? I know he wasn't because he was with me at another place. That's how I know that son of a bitch. He's a big dude, right? He's a big son of a bitch; just got out of prison.
....
Elizondo: I feel bad for you, man.
Gonzalez: I feel bad for you, though.
Elizondo: You're going to get the needle here in Texas. You don't show remorse, man; that's what sucks.
Gonzalez: Yeah, that's what bad.
The detectives then ended the first conversation. The recording of the second conversation began approximately twenty-four hours later. Detective Elizondo stated, "Alright, Joseph, like we told you at the jail, man; if you want to talk to us again, we have to do this to you, okay? I'm going to advise you of your rights again, alright?" The detectives read appellant the Miranda warnings again, and appellant indicated that he understood the warnings and that he wished to speak with the detectives.
Case law from the United States Supreme Court has "made clear that a finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient." Arizona v. Fulminante , 499 U.S. 279, 287, 111 S.Ct. 1246, 1252-53, 113 L.Ed.2d 302 (1991) ; Tovar v. State , 709 S.W.2d 25, 27 (Tex. App.-Corpus Christi 1986, no pet.) ("[A] confession must be free and voluntary and not obtained by any sort of threats or violence, nor by any direct or implied promises, however slight, nor by the exertion of any improper influence."). We do not condone the use in interrogations of threats of violence against the suspect. However, when considering the totality of *737 the circumstances and the context of appellant's conversations with the detectives in this case, we agree with the trial court that appellant's waiver of his Miranda rights at the beginning of the second conversation was knowing and voluntary and that his statements were not obtained by threats.
Although the detectives suggested they were getting other detectives to go get Stank-a large and probably violent man-and bring him into the interrogation room so he could hear appellant accuse him of being the shooter at the dice game, the detectives also repeatedly told appellant that they did not believe Stank actually existed and that, if he did exist, he was not involved with the dice game shooting because the detectives were already aware of everyone who was present at the dice game when the shooting occurred. In this context, the detectives telling appellant they were going to tell someone to go get Stank and bring him into the interrogation room to hear appellant's statement did not constitute a "credible threat" of violence against appellant. See Fulminante , 499 U.S. at 287, 111 S.Ct. at 1252-53.
Furthermore, as the State points out, the second and third conversations occurred approximately twenty-four hours after the first conversation, meaning appellant had nearly a day to consider whether to talk to the detectives again. This was, therefore, not a situation in which the detectives threatened appellant with imminent violence at the hands of Stank and then appellant immediately confessed. See ids="11318776" index="81" url="https://cite.case.law/us/499/279/#p287">id. at 283, 111 S.Ct. at 1250 (noting that prison informant offered to protect defendant from fellow inmates who were starting to treat defendant in rough manner, but only if defendant admitted involvement in offense, and defendant then confessed to informant); Payne v. Arkansas , 356 U.S. 560, 567, 78 S.Ct. 844, 850, 2 L.Ed.2d 975 (1958) (holding that defendant's confession was coerced when, among other factors, chief of police told defendant "that there would be 30 or 40 people there in a few minutes that wanted to get him" and defendant immediately confessed to avoid threat of mob violence); Zuliani v. State , 903 S.W.2d 812, 822 (Tex. App.-Austin 1995, pet. ref'd) ("An interruption in the stream of events between the initial coercion and the confession has been recognized as significant."). Nor is there any indication in the record that, after terminating the first conversation at appellant's request, the officers improperly contacted appellant. They waited for him to reinitiate contact prior to the second conversation. The detectives read appellant his Miranda warnings a second time, and appellant again indicated that he understood his rights before waiving them and speaking with the detectives.
Under these circumstances, we conclude that the detectives' conduct was not so coercive that appellant's statements made during the second and third conversations were "unlikely to have been the product of an essentially free and unconstrained choice by" appellant. See Alvarado , 912 S.W.2d at 211. The record does not reflect that appellant's will was "overborne" by police coercion. See Mason , 116 S.W.3d at 257. We therefore conclude that the trial court did not err by concluding that appellant voluntarily participated in the second and third conversations, and, thus, the court did not err by refusing to suppress these conversations in their entirety.
We overrule appellant's second issue.
Conclusion
We affirm the judgment of the trial court.

See Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2017).

Appellant objected to this testimony at trial, arguing that it was not relevant and constituted an inadmissible extraneous offense. The trial court overruled appellant's objection.

Appellant also argues, in his third issue, that the State presented factually insufficient evidence that he committed the charged offense of capital murder. The Court of Criminal Appeals has repeatedly held that we "do not review the factual sufficiency of the evidence to support a jury's finding on the elements of a criminal offense that the State is required to prove beyond a reasonable doubt." Lucio v. State , 351 S.W.3d 878, 895 (Tex. Crim. App. 2011) ; Martinez v. State , 327 S.W.3d 727, 730 (Tex. Crim. App. 2010) (noting that court has overruled prior case establishing standard of review for factual sufficiency of elements of charged offense). In light of this binding precedent from the Court of Criminal Appeals, we decline to undertake a factual sufficiency review of the evidence supporting appellant's conviction.