**Opinion issued June 20, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00152-CR
_____

**MARCUS WILLIAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 174th District Court
Harris County, Texas
Trial Court Case No. 1474264

# MEMORANDUM OPINION

A jury found appellant, Marcus Williams, guilty of the offense of aggravated robbery[1] and assessed his punishment at confinement for twenty-five years and a $10,000 fine. The trial court entered an affirmative finding that appellant used or exhibited a deadly weapon, namely, a firearm, in the commission of the offense. In two issues, appellant contends that the evidence is legally insufficient to support his conviction and that he was denied due process.

We affirm.

## Background

The complainant, Philman Harper, testified that, on June 29, 2015, he met a girl on a dating website, "Plenty of Fish." After talking for awhile, the girl invited him to her apartment, which was located near Highway 6 and Alief Clodine in Houston. When the complainant arrived, he called the girl, and she met him outside and told him where to park. As they walked toward the girl's apartment together, two men appeared. One of the men, whom the complainant identified as appellant, was carrying a "black gun." Appellant pointed the gun at the complainant and said, "Give me everything you have." The complainant had only his car keys and cellular phone, which he offered to appellant. Appellant refused them, however, and instructed the complainant to lead him to his car. Appellant and his accomplice

---

[1]     *See* TEX. PENAL CODE §§ 29.02(a)(1), 29.03(a).

2

began walking the complainant toward the parking lot. When the complainant stopped and tried to reason with appellant, appellant responded, "You must want to die" and shot the complainant in the arm. The complainant fell and "played dead," and the men ran away.

The complainant testified that, once he reached his car and drove away from the apartment complex, he called for emergency assistance. He stopped on Highway 6, where an ambulance met him and took him to Memorial Hermann Hospital. The complainant was hospitalized for a week and underwent surgery and physical therapy. He lost feeling in his left arm for over two months. The trial court admitted into evidence recordings of the complainant's 911 call and photographs of the scene and his car. The trial court also admitted the complainant's medical records, which revealed that he was shot in the left forearm and left upper abdomen, suffered internal bleeding, and had a bullet surgically removed from his lower pelvis.

The complainant further testified that, on July 1, 2015, while in the hospital, law enforcement presented him with a photographic array. In the array, he identified Jane[2] as the girl whose photo had appeared on the dating website. Days later, on July 6, 2015, he identified appellant in an array and noted, "This was the guy that

---

[2] We use pseudonyms to refer to actors who were, or appear from the record to have been, "minor[s] at the time the offense was committed." *See* TEX. R. APP. P. 9.10(a)(3); *see also Sada v. State*, No. 01-18-00240-CR, 2019 WL 1120106, at *1 (Tex. App.—Houston [1st Dist.] Mar. 12, 2019, no pet.) (using pseudonyms for minor children to protect their identities and for ease of reference).

shot me." He also identified George[3] in an array and noted, "The guy that was with him that shot me." On July 8, 2015, the complainant identified Gina[4] in an array as the girl he met at the apartments on the night he was shot. The complainant noted that he identified each person by circling and initialing their photograph.

Sergeant S. Ashmore of the Harris County Sheriff's Office ("HCSO"), who was assigned to investigate the robbery, testified that he identified Jane as a possible suspect after learning that the number of the cellular telephone used to lure the complainant was registered to her mother. Ashmore created a photographic array including Jane, presented it to the complainant, and the complainant affirmatively identified Jane as the girl whose photograph had appeared on the dating website. After Jane told Ashmore that it was not her, but her sister, Gina, who was actually involved in the robbery, Ashmore created an array including Gina and presented it to the complainant. The complainant affirmatively identified Gina as the person whom he had met at the apartment on the day of the robbery.

Sergeant Ashmore testified that he also developed as a possible suspect Jane's ex-boyfriend, Wayne.[5] On July 1, 2015, Ashmore presented an array including Wayne to the complainant. After the complainant did not identify anyone in the

---

[3] *See Sada*, 2019 WL 1120106, at *1.

[4] *See id.*

[5] *See id.*

4

array as having been involved in the robbery, however, Ashmore eliminated Wayne as a suspect. Ashmore explained that, in accordance with department policy at the time, because nobody was identified in the array, he did not upload the array to the law enforcement database or submit it to the prosecutor. Rather, he stored it in a case file at an HCSO substation. He testified that the file was later destroyed, along with numerous other files, when the substation flooded during Hurricane Harvey.

On July 6, 2015, after a Crime Stoppers tip identified appellant as the possible shooter and led to George as a possible accomplice, Sergeant Ashmore presented arrays containing photographs of each to the complainant. The complainant affirmatively identified appellant as the shooter and George as his accomplice. The trial court admitted into evidence the arrays including Jane, Gina, appellant, and George.

During cross-examination, defense counsel questioned Sergeant Ashmore further about the initial array containing Wayne:

Q.   Okay. So until August of—Hurricane Harvey, August 28th, 29th of [2017], you had never given the prosecutors a copy of that photo array?

A.   Not in this court, no, ma'am.

. . . .

Q.   . . . [Y]ou didn't think the photo of [Wayne] was important?

A.   No, ma'am. [The complainant] didn't make an identification. So at the time, unless you made an identification, you didn't download those photo arrays into our system. You only put the ones in where they actually made an identification.

5

Q. Have you ever made a statement under oath [that:] . . . "I showed him, the complainant, the one that had [Wayne] in it. He stated that is the one"—"it was one of the people, the male suspects" . . . ?

A. . . . I don't recall him saying that [Wayne] was one of the suspects.

Defense counsel then read from the transcript of a co-defendant's August 30, 2016 trial, in which Sergeant Ashmore testified as follows: "I showed [the complainant] the one that had [Wayne] in it. He stated that it was *one* of the people, the male suspects. . . ." (Emphasis added.)

Sergeant Ashmore's testimony in the instant case continued:

A. Well, ma'am, I think in front of that *one*, there should be an ["n"] or "none," because I told him none, because if he had identified him, I would have had him circle it and it would have been in the report. That's going to be a typo. I did not tell him—he said it was none—none of those males that I showed him were any of the suspects.

Q. So you're saying that the court reporter who did this just didn't type it correctly?

A. Yes, ma'am.

(Emphasis added.) And, on redirect, Ashmore testified:

Q. At any point in time, did [the complainant] identify anyone else other than [appellant] as the shooter in this case?

A. No, ma'am.

Q. At any other time, did he identify anybody else besides [appellant] or [George] as the two people—the two males who approached him that night?

A. No, ma'am.

6

Gina, appellant's co-defendant, testified that, at the time of the robbery in 2015, she was 14 years old and spending the summer with her sister, Jane, at the apartment. Gina's boyfriend, George, who was also age 14 at the time, lived in the same complex. Gina testified that, on the morning of the robbery, she was with Jane, George, and appellant. Appellant stated that he needed money, and the group decided to "set people up," which Gina explained meant that they intended to "lure people to wherever we was so they could rob them, whatever." Gina noted that George had obtained a firearm from his brother-in-law, which the group decided to use to execute the plan, and Gina saw appellant or George load it with hollow-point bullets. Gina created a profile on "Plenty of Fish," and the group passed around a cellular phone and responded to people on the website, including the complainant.

At around 5:00 a.m., the group decided to invite the complainant to the apartment to rob him. When he arrived, Gina met him. Appellant and George then approached, and appellant pointed a gun at the complainant and said, "Give me everything." When the complainant refused, appellant said, "Oh, you're trying to play" and shot the gun. Gina testified that she went back to the apartment, and appellant and George followed shortly after. When appellant arrived, he announced, "I killed him." The group hid the gun in the ceiling of the apartment, sat around until they heard sirens, and then pretended to be asleep.

## Sufficiency of the Evidence

In his second issue, appellant argues that the evidence is legally insufficient to support his conviction for aggravated robbery because the "only evidence supporting the jury's verdict is the testimony of a co-conspirator [Gina] and the identification of the appellant through a photographic line up." He asserts that there were "credibility issues with the co-conspirator" and that the complainant had identified "someone other than [appellant]" in the initial array.[6]

---

[6] We note that appellant does not argue that the State failed to corroborate the testimony of Gina, as an accomplice witness, and does not present analysis under the accomplice-witness rule. *See* TEX. CODE CRIM. PROC. art. 38.14 (providing that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed"). Rather, he presents argument and authority applying a rational-sufficiency standard. Unlike legal sufficiency, the accomplice-witness rule is not derived from federal or state constitutional principles. *See Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). The standard of review for sufficiency of corroborating evidence is "tendency to connect," rather than rational sufficiency. *See Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999); *Nealey v. State*, No. 01-15-00999-CR, 2017 WL 3389636, at *6 (Tex. App.—Houston [1st Dist.] Aug. 8, 2017, pet. ref'd) (mem. op., not designated for publication). Moreover, in reviewing the sufficiency of corroborating evidence, we exclude the accomplice testimony from our consideration and determine whether there is any independent evidence that tends to connect the defendant with the commission of the offense. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008); *Hernandez v. State*, 454 S.W.3d 643, 647 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). Here, we conclude below that the testimony of the complainant and of Sergeant Ashmore are sufficient on their own to support appellant's conviction. *See Hernandez v. State*, 454 S.W.3d 643, 648 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (holding that, after eliminating accomplice witness testimony from consideration, remaining evidence of complainant's identification of defendant, both in line-up and at trial, as man who placed gun to her head and robbed her, was sufficient to connect defendant to aggravated robbery).

*Standard of Review and Principles of Law*

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. The jury, as the judge of the facts and credibility of the witnesses, may choose to believe or not to believe the witnesses, or any portion of their testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jenkins v. State*, 870 S.W.2d 626, 628 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

A person commits the offense of robbery if, as pertinent here, "in the course of committing theft . . . and with intent to obtain or maintain control of the property," he "intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE § 29.02(a)(1). "Theft" is the unlawful appropriation of property with the intent to deprive the owner of the property. *Id*. § 31.03(a). "[T]he robbery statute

9

does not require that a theft be completed." *Cooper v. State*, 430 S.W.3d 426, 430 (Tex. Crim. App. 2014). "Bodily injury" means "physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE § 1.07(a)(8). A robbery is aggravated if, as pertinent here, the person also uses or exhibits a deadly weapon. *Id*. § 29.03(a). The term "deadly weapon" includes a firearm. *Id*. § 1.07(a)(17)(A).

*Analysis*

Here, the complainant testified that, as he walked to the apartment with Gina, appellant and George walked toward him. Appellant was holding a "black gun," which he pointed at the complainant and demanded, "Give me everything you have." *See id.* §§ 1.07(a)(17)(A), 29.02(a)(1), 29.03(a), 31.03(a). The complainant had only his car keys and phone, which he offered to appellant. Appellant refused them, however, and instructed the complainant to lead him to his car. As he began walking toward the parking lot with appellant and his accomplice, the complainant stopped and tried to reason with appellant. Appellant responded, "You must want to die" and shot the complainant in the arm. *See id.* § 29.03(a). The complainant fell and "played dead," and the men ran away. The complainant was taken by ambulance to a hospital, where he underwent surgery to remove a bullet from his lower pelvis. He also lost feeling in his left arm for over two months. *See id.* § 1.07(a)(8).

The record shows that the complainant identified appellant, days after the shooting and again during trial, as the shooter. Sergeant Ashmore also testified that

10

the complainant affirmatively identified appellant as the shooter. "It is well established that a conviction may be based on the testimony of a single eyewitness." *Davis v. State*, 177 S.W.3d 355, 359 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971)); *see Gibbs v. State*, 555 S.W.3d 718, 728 (Tex. App.—Houston [1st Dist.] 2018, no pet.)("Identity may be established by the testimony of a single eyewitness."); *Shah v. State*, 414 S.W.3d 808, 812 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) ("It is well-established that the testimony of a sole witness to an offense may constitute legally sufficient evidence to support a conviction."); *Smith v. State*, 421 S.W.3d 161, 164 (Tex. App.—San Antonio 2013, no pet.) ("A conviction for aggravated robbery may be based on the testimony of a single eyewitness.").

Appellant argues that the evidence is insufficient because the complainant identified "someone other than the appellant" in the initial photographic array containing Wayne. The record does not support his assertion. In the portion of the record appellant cites, the complainant testified simply that he "recognize[d]" someone in the initial lineup, as follows:

> Q. . . . . [D]o you remember meeting with Sergeant Ashmore to do some lineups on a certain day?
> A. Yes.
> Q. And when he first brought you the first set of lineups, did he show you a male and a—a male lineup and a female lineup?
> A. Yes.

11

Q.   And the very first male lineup you were shown, did you recognize anyone in that lineup?

A.   Yes.

Q.   In the very first one or—

A.   The first one, yes.

Q.   And let me reapproach. [Complainant], it's been almost three years since this happened to you?

A.   Yes.

The complainant later testified that he never identified anyone other than appellant as the shooter. Sergeant Ashmore also testified that, throughout the investigation, the complainant never identified anyone other than appellant as the shooter. It is the responsibility of the fact finder to fairly resolve conflicts in testimony. *Williams*, 235 S.W.3d at 750.

Based on the evidence, a rational jury could have inferred the ultimate fact that appellant was the individual who committed the aggravated robbery of the complainant. *See Smith*, 421 S.W.3d at 164–65 (holding that complainant's identification of defendant in photo line-up and later in front of jury was legally sufficient to support identification of defendant as perpetrator of aggravated robbery); *see also Gibbs*, 555 S.W.3d at 728 (holding that complainant's identification of defendant as shooter, in photo array right after shooting and again later in court, was sufficient to support conviction for capital murder).

Appellant further argues that the evidence is insufficient to support his conviction because the only testimony supporting the jury's verdict is that of "co-

12

conspirator" Gina, who presented "credibility issues."  Even setting aside Gina's testimony, however, the testimony of the complainant and of Sergeant Ashmore, as discussed above, is sufficient to support appellant's conviction.  Moreover, the jury is the sole judge of the facts, the credibility of the witnesses, and the weight to be given Gina's testimony.  *Williams*, 235 S.W.3d at 750.

Viewing the evidence in the light most favorable to the verdict, we conclude that the jury could have reasonably concluded that appellant, in the course of committing a theft from the complainant and with intent to obtain or maintain control of the complainant's property, i.e., "everything" he had, including his car, intentionally, knowingly, or recklessly caused the complainant bodily injury, using a deadly weapon.  *See* TEX. PENAL CODE §§ 1.07(a)(17)(A), 29.03(a); *Cruz v. State*, 238 S.W.3d 381, 387 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *see also Roberts v. State*, No. 01-10-00844-CR, 2011 WL 3525419, at \*3 (Tex. App—Houston [1st Dist.] Aug. 11, 2011, pet. ref'd) (mem. op., not designated for publication).  Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction.

We overrule appellant's second issue.

### Due Process

In his first issue, appellant argues that he was "denied due process by the failure of the State to timely produce exculpatory evidence, namely the lineup of the

13

initial suspect," Wayne, in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Appellant asserts that the "due process violation in this case stems not from the destruction of the evidence due to [Hurricane Harvey] but from law enforcement's failure to provide the exculpatory evidence to the District Attorney in a timely manner," i.e., before it was destroyed.

The State asserts that appellant "focuses his claim on the State's failure to preserve the photospread," which is governed by *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988), and not *Brady*. The State further asserts that, regardless, appellant waived his complaint because he did not raise a due process objection, under any theory, in the trial court.

### Legal Principles

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. A defendant is entitled to a new trial if he establishes that (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, that there is a reasonable probability that had the evidence been disclosed the outcome of the trial would have been different. *Pena v.*

*State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011); *State v. Fury*, 186 S.W.3d 67, 73 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

Under the first prong, an appellant must show that the State failed to disclose evidence "which had been known to the prosecution but unknown to the defense." *Ex Parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012) (noting that "the State" includes law enforcement connected to investigation and prosecution of case). Under the second prong, "[f]avorable evidence is any evidence that, if disclosed and used effectively, may make a difference between conviction and acquittal and includes both exculpatory and impeachment evidence." *Harm v. State*, 183 S.W.3d 403, 408 (Tex. Crim. App. 2006). Under the third prong, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Ex Parte Miles*, 359 S.W.3d at 666 (quoting *United States v. Agurs*, 427 U.S. 97, 109–10 (1976)). Rather, when evaluating whether the materiality standard is satisfied, the strength of the exculpatory evidence is balanced against the evidence supporting conviction. *Id*. An appellant must show that, "in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure." *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002).

In *Youngblood*, by contrast, the Supreme Court held that "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. at 57. The failure to preserve this "potentially useful evidence" does not violate due process "unless a criminal defendant can show bad faith on the part of the police." *Id.* at 58. As the Court explained in *Youngblood*:

> Part of the reason for the difference in treatment is . . . that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause . . . as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

*Id.* at 57–58 (citation omitted).

The Texas Court of Criminal Appeals has held that *Youngblood*, and not *Brady*, is properly applied in cases in which the government no longer possesses the disputed evidence. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999); *see Moody v. State*, 551 S.W.3d 167, 170–71 (Tex. App.—Fort Worth 2017, no pet.) ("[A]lthough he has phrased his complaint as a *Brady* complaint, it is more properly

16

considered as a complaint under *Youngblood* of the destruction of 'potentially useful evidence.'"); *Williams v. State*, No. 02-09-00175-CR, 2011 WL 1833136, at \*4 (Tex. App.—Fort Worth May 12, 2011, no pet.) (mem. op., not designated for publication) (treating *Brady* claim regarding destroyed evidence as *Youngblood* claim).

### *Preservation of Error*

As a threshold matter, the State argues that appellant failed to preserve this issue for review because he did not make a due process objection in the trial court based on the initial array and obtain an adverse ruling.

To preserve error for appellate review, an appellant must present to the trial court a timely, specific objection and obtain an adverse ruling. *See* TEX. R. APP. P. 33.1(a); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("To avoid forfeiting a complaint on appeal, the party must let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." (internal quotations omitted)); *see also Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) (holding that reviewing court should not address merits of issue not preserved for appeal).

A failure to object to constitutional errors waives appellate review of those claims. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *see also Neal*

*v. State*, 150 S.W.3d 169, 175, 178 (Tex. Crim. App. 2004) (concluding that due process claim not preserved because appellant failed to raise claim before trial court); *Alexander v. State*, 137 S.W.3d 127, 130–31 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (failure to object to trial court's violations of federal and state due process rights waives appellate review of those claims). When *Brady* evidence is discovered or disclosed at trial, the defendant must raise an objection as soon as the grounds for the complaint become apparent. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). A defendant's failure to request a continuance when *Brady* evidence is disclosed at trial arguably waives his complaint that the State has violated *Brady* and suggests that the tardy disclosure of the evidence was not prejudicial to him. *See Fury*, 186 S.W.3d at 73–74. Similarly, a due process claim based on *Youngblood* must be preserved. *See Guy v. State*, No. 03-12-00466-CR, 2014 WL 5423760, at *9 (Tex. App.—Austin Oct. 22, 2014, pet. ref'd) (mem. op., not designated for publication); *Johnson v. State*, No. 14-02-00663-CR, 2003 WL 1988593, at *2 n.2 (Tex. App.—Houston [14th Dist.] May 1, 2003, no pet.) (not designated for publication).

Here, the record does not reflect that appellant raised a due process objection in the trial court based on the initial array. Thus, appellant did not preserve his complaint for our review. *See* Tex. R. App. P. 33.1(a); *see Hull v. State*, 67 S.W.3d 215, 217 (Tex. Crim. App. 2002) (defendant waived due process complaint raised

18

for first time on appeal); *Wilson*, 71 S.W.3d at 146 (applying the Rule 33.1(a) error preservation requirements to *Brady* claim); *Jackson v. State*, 495 S.W.3d 398, 420 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (holding that because appellant "failed to raise *Brady* claim in the court below," issue waived on appeal).

Moreover, even if appellant had preserved this issue, he cannot prevail under *Brady* or *Youngblood*. A *Brady* claim requires proof that the sought-after evidence was both material and favorable to the defendant such that there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Pena*, 353 S.W.3d at 809. Appellant asserts that the complainant testified that "he did identify a person out of the first male lineup shown to him at the hospital," i.e., the array containing Wayne. Appellant also asserts that Sergeant Ashmore testified at a previous trial that the complainant identified "a male suspect other than appellant in the initial male lineup." As discussed above, the record does not support these assertions. Rather, the record shows that the complainant, seemingly confused about the five arrays he had viewed three years prior, merely testified that he "recognize[d] someone." The complainant unequivocally testified that he identified appellant as the shooter. And, Ashmore explained that the complainant never identified anyone other than appellant as the shooter. Thus, under *Brady*, appellant cannot show, in light of all the evidence, that it is reasonably probable that the outcome of trial would have been different had the initial array

19

been physically produced. *See Hampton*, 86 S.W.3d at 612; *see, e.g.*, *Burdick v. State*, 474 S.W.3d 17, 26 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (holding that exculpatory value of videos would have been slight when compared to body of inculpatory evidence State produced and that appellant did not show reasonable probability that outcome of trial would have been different, but for State's failure to preserve videos).

In addition, the record shows that defense counsel received the disclosure about the array at least in time to effectively question the complainant and Sergeant Ashmore at trial before the jury. *See Little*, 991 S.W.2d at 866 ("If the defendant received the material in time to use it effectively at trial, his conviction should not be reversed just because it was not disclosed as early as it might have and should have been."). The record is not developed regarding when appellant actually learned about the initial array. We note that, in cross-examining Ashmore, defense counsel read from the transcript of a 2016 trial.

Further, appellant asserts only that "there is a reasonable probability that the complaining witness identifying a suspect other than the accused in the hospital immediately after the incident *could have affected* the outcome of trial." (Emphasis added.) And, "at a minimum, the identification of another suspect has strong impeachment value that *could have affected* the credibility of the witnesses and the outcome of the case." (Emphasis added.) Thus, appellant argues, the array was, at

20

best, potentially useful. *See Youngblood*, 488 U.S. at 57. And, it is undisputed that the array was permanently destroyed. *See Little*, 991 S.W.2d at 866.

Under the standard applicable to lost or destroyed "potentially useful evidence" in *Youngblood*, the State's failure to preserve such evidence does not constitute a denial of due process unless a defendant shows bad faith on the part of the State. *See Youngblood*, 488 U.S. at 57–58; *see also Rodriguez v. State*, 491 S.W.3d 18, 31 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (treating *Brady* claim about lost surveillance video as *Youngblood* claim); *Gutierrez v. State*, 419 S.W.3d 547, 552 (Tex. App.—San Antonio 2013, no pet.) (noting distinction between "material exculpatory evidence" and "potentially useful evidence"). Here, appellant did not allege, or present evidence in the trial court, that law enforcement acted in "bad faith" concerning the destruction of the array. *See Youngblood*, 488 U.S. at 58; *Ex parte Napper*, 322 S.W.3d 202, 229 (Tex. Crim. App. 2010).

We overrule appellant's first issue.

## Conclusion

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).

21