**Opinion issued July 18, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-23-00402-CR**

**NO. 01-23-00403-CR**

_____

**JUSTIN RAVEON TRYON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 209th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1711621 & 1711624**

# MEMORANDUM OPINION

Justin Raveon Tryon was charged with second degree aggravated assault with a deadly weapon[1] and possession with intent to deliver a controlled substance, namely cocaine.[2] A jury convicted Tryon of both offenses. He was sentenced to 12 years' confinement for aggravated assault and 10 years' confinement for possession with intent to deliver—with the recommendation that he be placed on 8 years community supervision. In three issues on appeal, Tryon challenges the sufficiency of the evidence to support his convictions.

We affirm.

## Background

Shaquinta Meador and Tryon began dating around August 2020. On February 21, 2021, Tryon called Meador and asked if they could talk. Meador met Tryon that afternoon and they went to Hermann Park in Meador's Chevy Tahoe. When they arrived, Tryon asked Meador if they could move in together. Meador told Tryon no, because they were on two different paths, and Meador did not want her daughter, who was living with Meador at the time, "to be around the situation where harm could be brought to her."

---

[1] See TEX. PENAL CODE §§ 22.01, 22.02(a)(2). Appellate cause number 01-23-00402-CR is trial court case number 1711624.

[2] See TEX. HEALTH & SAFETY CODE § 481.112. Appellate cause number 01-23-00403-CR is trial court case number 1711621.

Meador and Tryon then left the park to eat at Texas Roadhouse. They left the restaurant without eating, however, because Meador wanted to go home. Meador could tell Tryon was upset that she wanted to go home, but he still wanted something to eat. Tryon drove to Chacho's, a restaurant in Houston and attempted to order food through the drive-thru. The male employee taking their order started "being smart," and Tryon started "going off on him" and "cuss[ing] him out." As they pulled up to the drive-thru window, a male employee exited the restaurant "trying to fight" Tryon.

Meador got out of the vehicle and tried to deescalate the situation. Eventually, the male employee went back inside the restaurant and a female employee, Maisha Williams, came out to take their order. Tryon "pulled out a gun," "cocked it upwards," and told Williams to "send him back out."

Williams testified that on that evening she was working as a cashier at Chacho's and became aware of a verbal altercation between an employee and a customer. She made contact with the customer outside the drive-thru, while the customer was inside his vehicle, which Williams described as "like a Suburban." The customer appeared to be in his 30s, African American, and had a female passenger.

Williams walked outside, and up to his vehicle, and noticed that the customer seemed angry, "like he just got into it with someone." When she tried to resolve the

3

issue, the customer pulled out a gun and cocked it. After he pulled a gun on her as she was standing at his window, Williams rushed back inside. The following day, Williams met with a detective and identified Tryon from a photo array.

After Williams went back inside the restaurant, Meador told Tryon that they needed to leave because the police were going to come. Tryon "spe[d] off real quick," and was driving erratically. According to Meador, Tryon was upset that she had told him he had to go home and could not stay the night with her, and every time she said something to him, "it seemed like he just got angrier." Tryon "smashed on the brake real hard," causing her to hit the dashboard with her chest. She then reached over and grabbed the keys and told Tryon he had to get out of the vehicle. As she reached over him and opened the driver's door, Meador then "slid[] over from the passenger's side so [she] could get into the driver's seat to try to go." Tryon got out of the vehicle and stood "[d]irectly outside the driver's door." Meador testified that the driver's door was open slightly and that the windows in the vehicle were up. As Tryon was standing just outside the vehicle, Meador testified that he said: "So you think I'm playing about you? You think I'm playing about you?"

Meador turned her head around as she tried to start the vehicle, and although she did not see Tryon shoot her, she "hear[d] the gun go off." At first, Meador did not realize that she was shot. She thought Tryon had "shot in the air or something just to shoot to scare [her]." However, once her arm started tingling, Meador realized

4

the "bone busted" in her arm. She later realized she had also been shot in the neck. Meador turned to Tryon, saw him holding a gun, and said to him: "You shot me."

Meador testified that Tryon appeared to be "shocked," denied shooting her, and told her, "let me take you home and take care of you." Meador, who could not find her phone, asked Tryon if she could call the police. Tryon said no, but eventually, after Meador told him he could make up a story to tell the police, he agreed to call 9-1-1. While they were waiting for police to arrive, Meador testified that she saw Tryon "putting his bag and stuff in the woods." She further described Tryon's bag as a backpack.

Once Houston Fire Department (HFD) and Houston Police Department (HPD) arrived on scene, Meador stated that she initially told an officer that they were shot at by someone in a silver Malibu, but that she said this because Tryon could hear her. However, Meador testified that as soon as she left the scene in the ambulance, she told the paramedics that Tryon was the one who shot her.

HFD Paramedic D. Lopez confirmed that, as soon as the ambulance began transporting her to the hospital, Meador told Lopez: "It was him; he shot me." She explained that she was referring to the male suspect who was still on scene, i.e., Tryon, as the person who shot her. Lopez further testified that when he arrived on scene, no one else was present except Meador and Tryon. Lopez told his partner to

radio HPD, who was still on scene with Tryon, to tell them that Meador had identified Tryon as the shooter.

HPD Sergeant M. Mendez and Officer E. Camacho also responded to the scene. Officer Camacho testified that when she arrived, she saw paramedics treating Meador in the ambulance and a male standing very near the open ambulance doors. Officer Camacho attempted to get a statement from Meador, but she was in pain and "had an urgency to leave." Officer Camacho identified Tryon in the courtroom as the male standing near the ambulance doors.

Sergeant Mendez testified that after the ambulance left to transport Meador to Ben Taub Hospital, he received information about the identity of the possible shooter, i.e., Tryon. Sergeant Mendez instructed Officer Camacho to handcuff Tryon and search him. In conducting the pat down search, Officer Camacho located a handgun. Officer Camacho then asked Sergeant Mendez to complete a full systematic search, which consisted of searching his clothing for any weapons or narcotics before he was placed in the patrol car. In doing so, Sergeant Mendez discovered a small clear bag of narcotics, a white powdery substance, in Tryon's jacket, which Tryon identified as cocaine.

C. Guidry, a senior forensic analyst at the Houston Forensic Science Center, testified that she tested the white powder found on Tryon's person and confirmed that the substance was cocaine. Guidry explained that cocaine is a controlled

6

substance, and the amount recovered from Tryon's possession had a total net weight of 9.45 grams.

Sergeant Mendez further testified that after Meador was transported to the hospital, he received information concerning a possible backpack related to Tryon. He directed another officer, Officer Kichamu, to search for the backpack in the tree line next to the street where Meador's vehicle was parked. Officer Kichamu located a backpack in the tree line and delivered it to Sergeant Mendez, who secured the backpack for Officer Camacho.

Officer Camacho searched the backpack and discovered 148.5 grams of marijuana, digital scales, clear plastic baggies, two glass jars, a brown journal, and 6.88 grams of Xanax. The journal contained notes, names, and the sketch of an apartment complex. Officer Camacho testified that, based on her training and experience, the contents of the backpack indicated an intent to deliver narcotics— i.e., "not for personal recreational use."

HPD Major V. Garcia was also assigned to investigate the incident for the Major Crimes Division. He responded to the scene and was tasked with taking pictures of the vehicle on the street. Major Garcia testified that during the time he was present at the location, he did not see any cars pass by—"there was no traffic. It was kind of isolated." He examined the vehicle and did not see any "bullet holes in the outside suggesting that the vehicle had been shot." He also looked for any

shell casings, but the only ones he found "were at a distance and old and weathered and had been run over."

Tryon testified at trial and admitted to going to Chacho's with Meador but denied pulling a gun while at the restaurant. Tryon testified that they left Chacho's to go to Meador's apartment to "smoke and drink," and he was driving erratically— "driving at a high rate of speed, swerving from lane to lane, stuff like that." Tryon stated that he was driving erratically because, as they were leaving Chacho's, he noticed a silver Malibu following them. According to Tryon, the Malibu continued following them, speeding up when they sped up, slowing down when they slowed down, and changing lanes when they changed lanes. Tryon exited the freeway and attempted to lose the Malibu in the neighborhoods, a few minutes away from Meador's apartment. But the Malibu caught up to them, and Tryon slammed on the brakes after he noticed "little flashes" in the side mirror, which he knew to be flashes "from the barrel of a gun."

Tryon stated that he knew what the flashes were because he hunts, "and when you hunt, you don't close your eyes when you shoot so [he] know[s] what the flash from a barrel looks like." As soon as Tryon slammed on the brakes, he got out of the vehicle, Meador threw it into park, and Tryon drew his gun and shot once at the Malibu. The Malibu sped around Tryon and drove off, after which Tryon realized

8

Meador was shot. Tryon testified that the windows of Meador's vehicle were down when he saw the flashes, but he rolled them up prior to slamming on his brakes.

Tryon additionally testified that he did not shoot Meador. Although he was initially confused about how Meador was shot, as soon as he saw the blood, he called 9-1-1. Once paramedics and police arrived, Tryon stated that he was cooperative and told the officers where they could find the gun and the cocaine. Tryon also stated that he had bought the cocaine earlier in the day for his personal use and had been using it throughout the day. Tryon asserted that he had not bought the cocaine to sell to anyone, and he denied any knowledge of, connection to, or ownership of the backpack or its contents.

## Sufficiency of the Evidence

In his first and second issues on appeal, Tryon challenges the legal and factual sufficiency of the evidence supporting his conviction for aggravated assault. According to Tryon, the State failed to establish his identity as the shooter and failed to establish the requisite mental state. In his third issue, Tryon challenges the legal sufficiency of the evidence supporting his conviction for possession of cocaine with intent to deliver. Tryon maintains the State failed to establish that the backpack found with the drug paraphernalia was his and, therefore, failed to establish that Tryon possessed the cocaine with intent to deliver.

9

## A. Standard of Review

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). In assessing the legal sufficiency of the evidence under the *Jackson* standard, "we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 318–19).

In conducting our review, we defer to the responsibility of the factfinder to "fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quoting *Jackson*, 443 U.S. at 318–19). The jury, as the sole judge of the facts and credibility of the witnesses, may choose to believe or disbelieve any witness or any portion of their testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012).

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a

defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). If the cumulative force of all the incriminating circumstances is sufficient to support the conviction, each fact need not point directly and independently to guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

"The key question is whether the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (internal quotations omitted). And our role on appeal is "restricted to guarding against the rare occurrence when a fact finder does not act rationally." *Id.* (internal quotations omitted).

## B. Aggravated Assault

With respect to Tryon's sufficiency of the evidence challenges to his conviction for aggravated assault, the Court of Criminal Appeals has held that the legal-sufficiency standard from *Jackson* "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks*, 323 S.W.3d at 895. We therefore disregard Tryon's assertion that the evidence is factually insufficient to support his conviction and focus solely on whether the evidence is legally sufficient to support his conviction. *See Malbrough v. State*, 612 S.W.3d 537, 559 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd).

11

Here, the record reflects that Tryon was charged with aggravated assault by intentionally and knowingly causing bodily injury to Meador, a person with whom Tryon had a dating relationship, by shooting Meador with a firearm, and that Tryon used and exhibited a deadly weapon, i.e., firearm, during the commission of the offense. Tryon contends there is insufficient evidence to prove that he was the person who shot Meador. Tryon further argues that even if he did shoot Meador, there is insufficient evidence to prove that he shot her intentionally or knowingly.[3]

A person commits ordinary assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE § 22.01(a)(1). The offense becomes aggravated assault if that person commits the offense of assault and causes serious bodily injury or uses or exhibits a deadly weapon during the commission of the assault. *See id.* § 22.02(a).

A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.*

---

[3] Because Tryon challenges the sufficiency of the evidence to support only these two elements—identity and the culpable mental state—we do not address the sufficiency of the evidence to support any other element. *See, e.g.*, *Murray v. State*, 457 S.W.3d 446, 448 n.1 (Tex. Crim. App. 2015) ("We solely address the sufficiency of the evidence as it pertains to the element of 'operating' in the DWI statute because Appellant challenged only that element of the statute.").

12

§ 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).[4]

Direct evidence of the requisite culpable mental state—the mens rea of the offense—is not required. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Mens rea is almost always proven through circumstantial evidence. *Herrera v. State*, 526 S.W.3d 800, 809 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *see also Tottenham v. State*, 285 S.W.3d 19, 28 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) ("[B]oth intent and knowledge may be inferred from circumstantial evidence and proof of a culpable mental state almost invariably depends on circumstantial evidence."). "A jury may infer intent from the acts, words, and conduct of the accused, as well as from the extent of the injuries and the relative size and strength of the parties." *Herrera*, 526 S.W.3d at 809–10. Additionally, a jury may infer that a criminal defendant intended the natural consequences of his acts. *See Ruffin v. State*, 270 S.W.3d 586, 591–92 (Tex. Crim. App. 2008).

"Identity may be established by the testimony of a single eyewitness." *Gibbs v. State*, 555 S.W.3d 718, 728 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *see also Shah v. State*, 414 S.W.3d 808, 812 (Tex. App.—Houston [1st Dist.] 2013, pet.

---

[4] Assault and aggravated assault causing bodily injury are result of conduct offenses. *Price v. State*, 457 S.W.3d 437, 442 (Tex. Crim. App. 2015) ("The gravamen of assault with bodily injury is injury, a result of conduct."); *Landrian v. State*, 268 S.W.3d 532, 540 (Tex. Crim. App. 2008) ("[A]ggravated assault with the underlying crime of assault by causing bodily injury . . . . is a result-oriented offense.").

ref'd) ("It is well-established that the testimony of a sole witness to an offense may constitute legally sufficient evidence to support a conviction."). Further, identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence. *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018); *see also Greene v. State*, 124 S.W.3d 789, 792 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) ("[E]yewitness identification is not necessary.").

In this case, the evidence supports the jury's determination that Tryon was the person who shot Meador and that he did so intentionally or knowingly. Meador testified that, after the confrontation at Chacho's, Tryon "spe[d] off real quick," and was driving erratically. She stated that he was upset that she had told him he had to go home, and every time she said something to him, "it seemed like he just got angrier."

Meador further testified that Tryon "smashed on the brake real hard," causing her to hit the dashboard with her chest. She then reached over and grabbed the keys and told Tryon he had to get out of the vehicle. Meador "slid[] over from the passenger's side so [she] could get into the driver's seat to try to go." After Tryon got out, Meador testified that he stood "[d]irectly outside the driver's door" and yelled "So you think I'm playing about you? You think I'm playing about you?"

The evidence further shows that Meador "hear[d] the gun go off" and then her arm started tingling. Meador realized the "bone busted" in her arm. She later

14

realized she had also been shot in the neck. Meador turned to Tryon, saw that he had a gun in his hand, and she said to him: "You shot me."

Meador testified that Tryon appeared to be "shocked," denied shooting her, and told her "let me take you home and take care of you." Meador, who could not find her phone, asked Tryon if she could call the police. Tryon said no, but eventually, after Meador told him he could make up a story to tell the police, he agreed to call 9-1-1. Once HFP and HPD arrived on scene, Meador stated that she initially told an officer that they were shot at by someone in a silver Malibu, but that she said this because Tryon could hear her. However, Meador testified that as soon as she left in the ambulance, she told the paramedics that Tryon is the one who shot her.

HFD Paramedic D. Lopez confirmed that, as soon as the ambulance began transporting her to the hospital, Meador told Lopez: "It was him; he shot me." And she explained that she was referring to the male suspect who was still on scene, i.e., Tryon, as the person who shot her. Lopez testified that when he arrived on scene, no one else was present except Meador and Tryon. Lopez told his partner to radio HPD, who was still on scene with Tryon, to tell them that Meador had identified Tryon as the shooter.

Although Tryon testified that he did not shoot Meador and that Meador must have been shot by an unidentified person in the Malibu that was following them, the

15

jury could have reasonably chosen to disbelieve Tryon's version of events—and we must defer to the jury's resolution. *See Merritt*, 368 S.W.3d at 525–26 (appellate court presumes jury resolved conflicting evidence in favor of verdict and defers to that determination).[5]   Accordingly, from all this evidence, the jury could have reasonably inferred that Tryon was the person who shot Meador. *See Ingerson*, 559 S.W.3d at 509 (identity may be proven by circumstantial evidence or by reasonable inferences from the evidence); *Isassi*, 330 S.W.3d at 638 (we defer to factfinder to weigh evidence and to draw reasonable inferences from basic facts to ultimate facts).[6]

Likewise, the record contains ample circumstantial evidence from which a reasonable jury could have concluded that Tryon had the requisite mens rea to find him guilty of aggravated assault, meaning that he was at least aware that his conduct was reasonably certain to cause bodily injury to Meador. *See* TEX. PENAL CODE § 6.03(a), (b).  In that regard, Meador testified that:

---

[5] *See also Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (jury, as sole judge of facts and credibility, may choose to believe or disbelieve any witness or any portion of their testimony).

[6] *See also Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) (discussing hypothetical of woman seen standing in office holding smoking gun who is next to body with gunshot wound on floor and concluding that "it is reasonable to infer that the woman shot the gun (she is holding the gun, and it is still smoking)," but also that, "[i]f she is the only person in the room with a smoking gun, then it is reasonable to infer that she shot the person on the floor").

- Tryon had pulled a gun on the employee at Chacho's that same evening;

- Following that interaction, he sped off and was driving erratically;

- Tryon was upset with Meador because she had told him he needed to go home and could not spend the night with her;

- He slammed on his brakes causing Meador to hit her chest on the dashboard;

- After Meador kicked Tryon out of her vehicle, he said to her: "So you think I'm playing about you? You think I'm playing about you?"; and

- Tryon only agreed to call the police once Meador suggested that he make up a story about how she got shot.

Additionally, Tryon testified that he was a hunter, that he knows "you don't close your eyes when you shoot," and that he was familiar with bullets and guns.

Based on this evidence, the jury could have reasonably inferred that Tryon, who was a knowledgeable "hunter" who knew how to handle a gun, who was upset with Meador after she made him leave her vehicle, and who shot the gun at her vehicle, had the "conscious desire to engage in the conduct or cause the result" or was "aware that his conduct [was] reasonably certain to cause the result" of injuring Meador. *See* TEX. PENAL CODE § 6.03(a), (b); *Forest v. State*, 989 S.W.2d 365, 368 (Tex. Crim. App. 1999) (holding that "firing a gun in the direction of an individual is an act clearly dangerous to human life" and thus evidence of intent to cause serious bodily injury).[7]

---

[7] *See also Darkins v. State*, 430 S.W.3d 559, 565 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("Intent may also be inferred from the use of a deadly weapon, unless it would not be reasonable to infer that death or serious bodily injury could

We overrule Tryon's first and second issues.

## C.     Possession with Intent to Deliver a Controlled Substance

Lastly, in his third issue, Tryon challenges the legal sufficiency of the evidence to support his conviction for possession with intent to deliver the controlled substance of cocaine. Specifically, Tryon contends the evidence linking him to the backpack was insufficient to prove that he had the intent to deliver.[8]

In a possession with intent to deliver case, the State must prove that the defendant: (1) exercised care, custody, control, or management over the controlled substance; (2) intended to deliver the controlled substance to another; and (3) knew that the substance in his possession was a controlled substance. TEX. HEALTH & SAFETY CODE § 481.002(38), 481.112(a); *Nhem v. State*, 129 S.W.3d 696, 699 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

Intent to deliver a controlled substance may be proved by circumstantial evidence. *Mack v. State*, 859 S.W.2d 526, 528 (Tex. App.—Houston [1st Dist.]

---

result from use of the weapon."); *Reyes v. State*, No. 02-09-00097-CR, 2010 WL 1633424, at *3 (Tex. App.—Fort Worth Apr. 22, 2010, no pet.) (mem. op., not designated for publication) (holding evidence was sufficient to support mens rea for aggravated assault because jury was entitled to infer from evidence that, by shooting gun into vehicle, defendant had the "conscious objective or desire to engage in the conduct or cause the result" or was "aware that his conduct [was] reasonably certain to cause the result" of injuring complainant, even though no one saw defendant fire gun).

[8]     As intent to deliver is the only element challenged by Tryon, we address only the sufficiency of the evidence to support that element. *See Murray*, 457 S.W.3d at 448 n.1.

18

1993, no pet.). An oral expression of intent is not required; intent can be inferred from the acts, words, and conduct of the accused. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). Factors that courts have considered to establish the intent to deliver include, but are not limited to: (1) the nature of the location where the defendant was arrested; (2) the quantity of the controlled substances in the defendant's possession; (3) the manner of packaging of the controlled substances; (4) the presence of narcotics paraphernalia (for either use or sale); (5) the defendant's possession of a large amount of cash; (6) the defendant's status as a narcotics user; and (7) an officer's testimony stating that the amount of the controlled substances recovered is consistent with the intent to deliver. *See Williams v. State*, 902 S.W.2d 505, 507 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (considering factors one through six); *Reece v. State*, 878 S.W.2d 320, 325 (Tex. App.—Houston [1st Dist.] 1994, no pet.) (considering factor seven).

These are evaluative factors for the court to consider when reviewing the sufficiency of the evidence. *Kibble v. State*, 340 S.W.3d 14, 19 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). And all of them are not required to be present. *Id.* Moreover, expert testimony by experienced law enforcement officers may be used to establish an accused's intent to deliver. *See Mack*, 859 S.W.2d at 529.

Here, Tryon argues there is no evidence that the amount of cocaine he possessed "was so great only a dealer of drugs would have such an amount." Thus,

according to Tryon, the only evidence from which the jury could infer an intent to deliver came from the contents of the backpack that police officers found in the tree line near Meador's vehicle. Tryon also argues that although Meador testified that she saw him go into the woods near the vehicle with a backpack—she did not identify the backpack that was recovered as being the same as the one she saw Tryon with, nor did she testify as to the contents of the backpack. And there was nothing in the backpack affirmatively linking it or its contents to Tryon—no fingerprinting or DNA analysis was done on the contents of the backpack. Tryon asserts there is no more than a modicum of evidence linking him to the backpack, and thus, the requisite intent to deliver. We disagree.

Although not every "intent to deliver" factor is present here, there is evidence of the presence of narcotics paraphernalia for sale, the lack of the presence of paraphernalia for use, and officer testimony indicating that the items recovered are consistent with the intent to deliver. There is also a lack of evidence about Tryon's status as a narcotics user.

Specifically, Meador testified that while they were waiting for police to arrive, she saw Tryon "putting his bag and stuff in the woods." She explained that by "his bag" she meant a backpack, and that she could "see him putting stuff in the woods."

Additionally, Sergeant Mendez testified that he received information concerning a possible backpack related to Tryon, and he directed Officer Kichamu

to search for the backpack in the tree line next to the street where Meador's vehicle was parked. Officer Kichamu located the backpack in the tree line and delivered it to Sergeant Mendez, who secured it for Officer Camacho.

The State also introduced Exhibit 15, a photograph of the front of Meador's parked vehicle "with a flashlight pointing into the tree line." Sergeant Mendez testified that, based on the information he received related to the backpack, he directed Officer Kichamu to search for the backpack along this tree line and that this is where Officer Kichamu retrieved the backpack. Sergeant Mendez further testified that, prior to receiving the information related to the backpack, he would not have had any other reason to search this particular area for a backpack.

Officer Camacho further testified that she searched the backpack and discovered 148.5 grams of marijuana, digital scales, clear plastic baggies, two glass jars, a brown journal, and 6.88 grams of Xanax. The journal contained notes, names, and the sketch of an apartment complex. Officer Camacho testified that, based on her training and experience, the contents of the backpack indicated an intent to deliver narcotics—i.e., "[i]t's not for personal recreational use."

Sergeant Mendez testified that he personally searched Tryon and found cocaine. He further testified that the scales discovered in the backpack were small and of the type used to weigh narcotics. Finally, Sergeant Mendez testified that the

21

cocaine he found in Tryon's jacket was in a clear plastic bag, which was similar to the baggies found in the backpack.

Moreover, the record contains no evidence that the officers discovered any drug paraphernalia for personal use—only paraphernalia associated with sale or delivery. *See Mack*, 859 S.W.2d at 529 (finding that absence of paraphernalia for smoking or using cocaine supports inference that accused intended to deliver, rather than consume, contraband). Nor was there any evidence indicating that Tryon appeared to be under the influence of narcotics when he was arrested. To the contrary, Sergeant Mendez and Officer Camacho testified that Tryon was compliant, and Tryon himself testified that he was calm and cooperative. Although Tryon testified that he had been using cocaine throughout the day, Meador testified to the contrary—that she let him drive her vehicle from the park because she had two drinks, and she did not see him consume any alcohol or drugs throughout the night.

Based on this record, the jury could have reasonably inferred that the backpack discovered in the tree line next to Meador's vehicle was Tryon's.[9] And viewing the evidence in the light most favorable to the verdict and the reasonable

---

[9]    *Cf. Bush v. State*, No. 01-10-00681-CR, 2011 WL 5429013, at \*4–5 (Tex. App.—Houston [1st Dist.] Nov. 10, 2011, no pet.) (mem. op., not designated for publication) (holding evidence legally sufficient to link defendant to narcotics found in patrol car where officer searched car before his shift and narcotics were found close to where appellant was sitting); *Goracki v. State*, No. 01-01-00101-CR, 2002 WL 537972, at \*2–3 (Tex. App.—Houston [1st Dist.] Apr. 11, 2002, no pet.) (not designated for publication) (same).

inferences from the evidence, we likewise conclude that the jury could have reasonably found beyond a reasonable doubt that Tryon possessed the cocaine with the intent to deliver. *See id.* at 528 (intent to deliver may be proved by circumstantial evidence).[10] Thus, we hold that the evidence is legally sufficient to support Tryon's conviction for possession with intent to deliver a controlled substance, namely, cocaine.

We overrule Tryon's third issue.

---

[10] *See also Boykin v. State*, No. 01-12-00291-CR, 2013 WL 4508366, at *3 (Tex. App.—Houston [1st Dist.] Aug. 22, 2013, no pet.) (mem. op., not designated for publication) (holding jury could have reasonably inferred that defendant possessed crack cocaine with intent to deliver because defendant was seen throwing pill bottle over fence, which contained 30-65 single servings of crack cocaine, no drug paraphernalia for narcotics use was found, and defendant did not appear to be under influence of drugs at time of arrest); *Brooks v. State*, No. 10-07-00309-CR, 2011 WL 540527, at *3–4 (Tex. App.—Waco Feb. 16, 2011, pet. ref'd) (mem. op., not designated for publication) (holding legally sufficient evidence to support defendant's conviction of possession with intent to deliver controlled substance where evidence showed that defendant was seen tossing two plastic baggies, which contained marijuana, cocaine, and ecstasy, he had no narcotics paraphernalia, and he did not appear to be under the influence of narcotics when he was arrested).

## Conclusion

For all the reasons above, we affirm the trial court's judgment in all things in each cause number.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Kelly and Goodman.

Do not publish. TEX. R. APP. P. 47.2(b).