

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-23-00011-CR

Romeo Alberto **IBANEZ-BARRERA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 381st Judicial District Court, Starr County, Texas
Trial Court No. 21-CR-25
Honorable Jose Luis Garza, Judge Presiding

Opinion by:     Lori I. Valenzuela, Justice

Sitting:     Irene Rios, Justice
             Lori I. Valenzuela, Justice
             Velia J. Meza, Justice

Delivered and Filed: March 12, 2025

AFFIRMED

A jury convicted Romeo Alberto Ibanez-Barrera of murder and tampering with evidence. The jury assessed punishment at life imprisonment for murder, ten years' confinement for tampering with evidence, and a $10,000 fine for each offense. On appeal, Ibanez-Barrera asserts four issues: (1) the trial court erred by instructing the jury on the law of parties; (2) the evidence was insufficient to support a conviction for murder because Ibanez-Barrera contends it consisted "merely" of uncorroborated accomplice testimony; (3) the trial court erred in admitting unreliable

and confusing testimony of an unqualified expert witness; and (4) the trial court erred in denying Ibanez-Barrera's motion to suppress. We affirm.

## BACKGROUND

On November 7, 2020, Ibanez-Barrera, Cristobal Vasquez, III, and Francisco Jesus Hinojosa attended a multi-day party at Ibanez-Barrera's home in Roma, Texas. Along with others, the three consumed copious amounts of crack cocaine, cocaine, marijuana, and alcohol. Around midnight on November 8, 2020, Vasquez and a woman left Ibanez-Barrera's residence in one of Ibanez-Barrera's vehicles—a maroon Dodge dual-rear-wheel truck (the "Maroon Dually") to purchase additional drugs at a local drug dealer's house. Noe Manuel Ramirez, Jr., was at the drug dealer's house. Vasquez purchased crack cocaine from the drug dealer and consumed a portion of it with Ramirez and the woman inside the Maroon Dually. Vasquez and the woman later returned to Ibanez-Barrera's home, while Ramirez remained at the drug dealer's home.

On November 8, 2020, at 4:32 a.m., Ramirez texted Vasquez to ask whether Ramirez left his keys inside the Maroon Dually. At 5:08 a.m., Vasquez responded affirmatively. Presumably to return Ramirez's keys, Vasquez and Ibanez-Barrera later traveled in the Maroon Dually to the drug dealer's house.

At trial, Vasquez testified as follows: Ibanez-Barrera's relationship with Ramirez soured approximately a year earlier because Ibanez-Barrera believed Ramirez stole money from him while they were on a trip to Houston to sell drugs.[1] However, Vasquez had no idea Ibanez-Barrera intended to murder Ramirez at the time they left Ibanez-Barrera's house to return Ramirez's keys. Upon arriving at the drug dealer's house, Ibanez-Barrera moved from the passenger seat to the middle backseat of the Maroon Dually, and Ramirez sat in the front passenger seat. As Vasquez

---

[1] November 3, 2020, text messages between Vasquez and Ibanez-Barrera admitted at trial show Ibanez-Barrera considered Ramirez a "bastard," and Ibanez-Barrera ominously stated, "December is here already."

drove, the three consumed crack cocaine. Vasquez took a hit of crack cocaine, and shortly after, Ibanez-Barrera used a chrome revolver to shoot Ramirez two to four times on the left and back sides of Ramirez's head. After the shots, Ibanez-Barrera ordered Vasquez to drive six more blocks before Ibanez-Barrera opened the passenger side door and shoved Ramirez's body out of the Maroon Dually and onto the street.

The medical examiner concluded that Ramirez died from two gunshot wounds to the head. Surveillance footage later recovered during the murder investigation showed the Maroon Dually traveling in the area where Vasquez testified the shots occurred. In the video, a long, bright light emanates from the driver area of the cabin, and concurrently and shortly thereafter, multiple short flashes appear in the center of the cabin. At trial, the State displayed the video to the jury and contended it corroborated Vasquez's account—the longer flash was Vasquez lighting up a crack pipe, and the short bursts were gunshots. Additional video showed the Maroon Dually pull into the middle of a street, the passenger door open, and the Maroon Dually depart, leaving Ramirez's body behind.

After the murder, Vasquez and Ibanez-Barrera returned to Ibanez-Barrera's home. During the following hours, the two of them showered and changed clothes at Ibanez-Barrera's house located on his property. Sometime before 8:00 a.m., Ibanez-Barrera, Vasquez, and Hinojosa cleaned the inside of the Maroon Dually, removed seats from the Maroon Dually, placed the seats in a horse stable, which is also located on Ibanez-Barrera's property, and began burning the seats. Additional materials may also have been destroyed by the fire.

At approximately 8:00 a.m., a DPS trooper conducted a traffic stop on a brown GMC truck just outside of Ibanez-Barrera's property.[2] Vasquez was driving the truck, and Ibanez-Barrera was

---

[2] The trooper's body camera footage was admitted at trial.

in the passenger seat. During the traffic stop, Vasquez and Ibanez-Barrera told the trooper that they were returning home from a ranch, where they had filled deer feeders and spent the night. The trooper conducted a field sobriety test on Vasquez and issued an open container citation before releasing both men.

Separately, in the early morning of November 8, 2020, Investigator Jose Luis Alvarez first arrived where Ramirez's body was found and observed the surveillance video showing Ramirez's body being dumped out of the Maroon Dually. The video was quickly circulated on social media. After a 911 call reported a fire at Ibanez-Barrera's property, officers who had viewed the surveillance video reported the Maroon Dually matched the description of the suspect vehicle, observed blood inside the Maroon Dually, and saw burned truck seats in the horse stable. Ibanez-Barrera reported to firefighter Lino Cavazos, Jr. that the fire resulted from Ibanez-Barrera burning a dog bed; however, it was clear to Cavazos after the fire was extinguished that the remaining large metal frames belonged to vehicle seats, not a dog bed. Moreover, the seats in the Maroon Dually had been removed, and what was suspected blood (and later confirmed to be Ramirez's blood) was visible in and around the Maroon Dually.

Ibanez-Barrera was transported to the Roma Police Department for questioning. Roma police requested investigatory assistance from the Texas Rangers, who arrived at the scene and began processing evidence. After processing the scene at Ibanez-Barrera's property, Alvarez traveled to the Roma Police Department to question Ibanez-Barrera. By the time Alvarez questioned Ibanez-Barrera at the police department, Ibanez-Barrera had been under arrest for felony tampering with evidence for approximately three hours. Alvarez Mirandized Ibanez-Barrera and informed him of his rights; however, this process was complicated because Ibanez-Barrera

only speaks Spanish. According to Ibanez-Barrera, Alvarez omitted a portion of the pre-printed Miranda warning statement in Spanish.

During the custodial interview, Ibanez-Barrera asserted the Maroon Dually had been parked for approximately one month and stated that he never lends his truck to anyone. Ibanez-Barrera also claimed Vasquez was with him the morning of the murder. During the interview, Ibanez-Barrera never inquired why he was being arrested or interrogated; asserted he was burning a torn seat where his dogs would sleep; claimed the driver's seat of the Maroon Dually was removed because it was broken; claimed the burned seats belonged to a blue dually that he also owned; and asserted that he was at the ranch with Vasquez the previous night. When confronted with the fact that the interrogation involved a murder and not simply tampering with evidence, Ibanez-Barrera stated "Okay"—he never inquired who the suspected victim of the murder was. Ibanez-Barrera also volunteered to take a gunshot residue test—although, at that time, no one had advised Ibanez-Barrera that the victim had been shot with a firearm.

Ibanez-Barrera was thereafter indicted on two felony counts: murder and tampering with evidence. At trial, the State adduced testimony from twelve witnesses. The parties stipulated to the testimony of seven additional witnesses during the State's case in chief. The defense called four witnesses. The charge of the court included a special issue requesting the jury to make a deadly weapon finding. The jury found Ibanez-Barrera guilty of murder and tampering with evidence but did not make an affirmative finding of a deadly weapon. The jury assessed punishment and this appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, Ibanez-Barrera asserts that the evidence does not support a jury instruction on the law of parties because the entirety of the State's evidence relied on the uncorroborated

accomplice testimony of co-defendants Vasquez and Hinojosa. In his second issue, Ibanez-Barrera asserts the evidence is insufficient to convict him of murder under the law of parties. Because the resolution of both issues turns on evidentiary sufficiency, we review both issues together.

### *Standard of Review—Sufficiency of Evidence*

In a sufficiency claim, our role is "restricted to guarding against the rare occurrence when a factfinder does not act rationally[.]" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We assess the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). "The essential elements of the offense are defined by the hypothetically correct jury charge for the case." *Ramos v. State*, 407 S.W.3d 265, 269 (Tex. Crim. App. 2013). Conflicting inferences are resolved in favor of the verdict. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Direct and circumstantial evidence are treated equally, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

"In reviewing the sufficiency of the evidence, we look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (internal quotation marks omitted). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction." *Id.*

On appeal, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the

verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). Thus, we "are not permitted to use a 'divide and conquer' strategy for evaluating sufficiency of the evidence" because that approach does not consider the cumulative force of all the evidence. *Hacker v. State*, 389 S.W.3d 860, 873 (Tex. Crim. App. 2013). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *See Hooper v. State*, 214 S.W.3d 9, 12 (Tex. Crim. App. 2007). We review the factfinder's weighing of the evidence and cannot substitute our judgment for that of the factfinder. *Brooks v. State*, 323 S.W.3d 893, 911–12 (Tex. Crim. App. 2010).

### *Standard of Review—Jury Instruction*

We reverse convictions for charge error only if actual harm to a defendant occurred. If no objection to the charge error was made, as here, we only reverse for "egregious harm." *Black v. State*, 723 S.W.2d 674, 675 n.2 (Tex. Crim. App. 1986). Egregious harm results from error affecting the very basis of the case, depriving the defendant of a valuable right, or vitally affecting a defensive theory. *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006). In assessing whether a charge was egregiously harmful, we consider "(1) the entire jury charge; (2) the state of the evidence, including contested issues; (3) arguments of counsel; and (4) any other relevant information contained in the record as a whole." *Gelinas v. State*, 398 S.W.3d 703, 705–06 (Tex. Crim. App. 2013).

### *Applicable Law*

A trial court must deliver to the jury a written charge distinctly setting forth the law applicable to the case. TEX. CODE CRIM. PROC. art. 36.14. The jury charge must apply the law to the facts adduced at trial. *Gray v. State*, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004).

A trial court may instruct the jury on the law of parties if "there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999). The State does not have to prove it is correct regarding the defendant's participation as a party but need only show that the evidence raises the issue to be entitled to its submission. *In re State ex rel. Weeks*, 391 S.W.3d 117, 124–25 (Tex. Crim. App. 2013). Further, the trial court may submit a charge allowing the jury to convict the defendant as a principal actor or as a party; submission of one theory does not prohibit the submission of the other. *Goff v. State*, 931 S.W.2d 537, 545 (Tex. Crim. App. 1996).

As applicable to our analysis, a person commits the offense of murder if the person "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(2). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a). Each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice. *Id.* § 7.01(c). A person is criminally responsible for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id*. § 7.02(a)(2). "Party participation may be shown by events occurring before, during, and after the commission of the offense and may be demonstrated by actions showing an understanding and common design to do the prohibited act." *Salinas v. State*, 163 S.W.3d 734, 739–40 (Tex. Crim. App. 2005). "Each fact need not point directly to the guilt of the defendant, as long as the cumulative effect of the facts is sufficient to support the conviction under the law of parties." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim.

App. 2012). Circumstantial evidence may be used to prove that a person is a party to an offense. *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006).

### *Analysis*

After finding Ibanez-Barrera guilty of murder, the jury was asked by a special issue in the charge, "Do you find from the evidence beyond a reasonable doubt that the Defendant used or exhibited a deadly weapon, to wit: a firearm, during the commission of the Murder?" The jury answered, "We do not." Ibanez-Barrera argues that because the jury found he did not use a firearm during the murder (and a firearm was the only cause of death as an evidentiary matter), the jury could only have logically convicted Ibanez-Barrera of murder under the law of parties. Specifically, Ibanez-Barrera asserts that because the jury found that Ibanez-Barrera was not the primary actor, the law of parties instruction gave the jury an "impermissible avenue to convict" Ibanez-Barrera of murder. Additionally, Ibanez-Barrera concludes that the State failed to adduce corroborating evidence to support co-defendants' Vasquez and Hinojosa's testimony and, as a result, there was insufficient evidence on which to charge the law of parties, necessitating reversal of Ibanez-Barrera's murder conviction.

In response, the State asserts the trial court correctly instructed the jury on the law of parties. Referring to only corroborating evidence, the State points to text messages establishing Ibanez-Barrera's motive to kill Ramirez—that Ibanez-Barrera disliked Ramirez after a trip to Houston to sell drugs resulted in Ibanez-Barrera believing Ramirez stole money or drugs from him. Text messages also confirmed that Vasquez and Ibanez-Barrera were at Ibanez-Barrera's house the night before the murder and not at the ranch as they told police. The jury could have credibly determined that Ibanez-Barrera lied about and sought to hide his participation in

Ramirez's murder based on the corroborating text messages, the body camera footage from the traffic stop, and Ibanez-Barrera's custodial interrogation.

Moreover, the jury could have credibly believed Ibanez-Barrera lied about and sought to hide his participation in Ramirez's murder based upon physical evidence—including Ramirez's blood inside and around the Maroon Dually and the vehicle seats removed from the Maroon Dually destroyed in the fire on Ibanez-Barrera's property. Smoke from the fire was visible in the trooper's body camera during the traffic stop the morning after the murder, but Ibanez-Barrera did not appear concerned with the smoke emanating from his property.

The jury could have also considered, and could have disbelieved, Ibanez-Barrera's statements during his custodial interrogation and to the firefighter that he had burned a dog bed and the Maroon Dually had not been driven for a month or longer. Ibanez-Barrera's statements were also at odds with both the burned vehicle seats found by the firefighters in the horse stable and video testimony showing the Maroon Dually disposing of Ramirez's body.

Furthermore, Ibanez-Barrera's statement that he never lends his truck to anyone undercuts any suggestion that he was not present when Ramirez's murder occurred. The jury could have believed Ibanez-Barrera did not lend his truck to anyone and, therefore, believed he was present during the murder.

The surveillance video captured shortly before the disposal of Ramirez's body shows two distinct light sources from inside the Maroon Dually at the time Vasquez described the murder occurring. According to the State, "[S]till frames from this same surveillance video shows the two sources of light, simultaneously, where the light emitting from the driver's side appear to be longer in time and brighter. The second source of light appears in short bursts of light that are much fainter, appear to come from the rear of the vehicle, and is [sic] believed to be bursts of light from

gunshots. This would entirely corroborate Vasquez's account of the time, place, and methods of the murder of Ramirez. Especially given that [Ibanez-Barrera's] alibi hinged on the fact that [Ibanez-Barrera] spent the night together with Vasquez."

Ibanez-Barrera's actions after the murder further corroborate Vasquez and Hinojosa's testimony. Ibanez-Barrera freely admitted to officials on multiple occasions to have set objects on fire in the horse stable, although he repeatedly changed his description of the items that he claimed to have burned—at times, stating he was burning dog beds, clothes, or trash. Further, Ibanez-Barrera volunteered during his custodial interrogation to take a gunshot residue test before any investigator informed him of Ramirez's cause of death, suggesting he had independent knowledge of how Ramirez was killed.

Further corroborating evidence includes data extracted from Ibanez-Barrera's phone, including a series of phone calls and physical activity during the time Vasquez and Hinojosa testified Ibanez-Barrera actively used his phone and when the three co-defendants were physically cleaning the truck, removing the seats, burning the seats, and walking around the property.

After reviewing the record, we find the State's evidence raised the issue of law of parties, and the trial court correctly submitted a charge allowing the jury to convict Ibanez-Barrera as a principal actor or as a party. We further conclude there is sufficient evidence outside of Vasquez and Hinojosa's testimony to support a guilty verdict finding Ibanez-Barrera criminally responsible under the law of parties, including surveillance videos, Ibanez-Barrera's custodial interview, testimony by witnesses involved in the investigation, physical evidence, and digital evidence. *See Ladd*, 3 S.W.3d at 564. Finding no error, we need not address harm. *See* TEX. R. APP. P. 47.1. We overrule Ibanez-Barrera's first and second issues.

## EXPERT QUALIFICATION AND TESTIMONY

In his third issue, Ibanez-Barrera asserts the trial court erroneously admitted confusing and misleading testimony by an unqualified expert.

### *Standard of Review and Applicable Law*

We review a trial court's admission of expert testimony for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). Admission of expert testimony requires three separate conditions: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006) (citation omitted). These are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id.* If we conclude a trial court erroneously admitted expert testimony, we review the record for harm. *See* TEX. R. APP. P. 44.2(b).

### *Analysis*

### *Qualification*

On appeal, Ibanez-Barrera first argues Investigator Natividad Gonzalez was unqualified to testify about data derived from the iHealth application regarding the distance Ibanez-Barrera traveled during the morning of the murder. Specifically, Ibanez-Barrera asserts, "None of investigator Gonzalez's knowledge, training, education, or experience involved interpreting data from the iHealth application or any phone application sufficient under TEX. R. EVID. 702. Investigator Gonzalez admitted he could not determine whether the distance measured on the phone application was accurate or whether the steps recorded were running or walking." In essence, Ibanez-Barrera argues Gonzalez needed to be, and was not, a software engineering expert

on how iHealth collects and processes data—as opposed to an expert in extracting data from phones. We reject this suggestion.

Gonzalez's relevant qualifications were well-established during a pre-trial hearing and again at trial. At trial, Gonzalez explained his task in assisting criminal investigations through extracting data from cellular phones. Gonzalez received specialized federal training at the National Computer Forensics Institute for mobile device examinations and data extractions from cell phones. He received a total of three certifications—Cellebrite Certified Operator certification, Mobile Device Examiner certification, and Digital Evidence Information Investigations certification. As a device examiner, Gonzalez reports the contents of a given device. During his career, he had conducted between seventy and one hundred cellular phone examinations.

Importantly, Gonzalez did not interpret or opine on data extractions from Ibanez-Barrera's phone. Nor did he opine on how iHealth collects or processes data. Instead, Gonzales explained to the jury the process for extracting phone data and authenticated the report generated by Cellebrite software based on the extracted data. Gonzalez was not required to have specific knowledge of the software engineering of the iHealth application to present this information. Rather, Gonzalez simply presented a "Cellebrite Extraction Report" to the jury, and Gonzalez holds a Cellebrite Certified Operator certification. Once extracted from the phone, the iHealth data was readily understandable to lay jurors, and the jury was entitled to give it the weight they determined it was due. We conclude the trial court did not err in determining Gonzalez was qualified.

*Reliability and Confusion*

Ibanez-Barrera next argues Gonzalez's testimony was unreliable and confusing to the jury. Specifically, Ibanez-Barrera contends "the State, through its expert, led the jury on a confusing

series of attempts at elementary mathematics in its attempt to convert distance from meters to yards and presumably illustrate the distance [Ibanez-Barrera] traveled on the night of the Murder."

Although the State's examination of Gonzalez contains a portion in which it is clear Gonzalez was unprepared to discuss converting between metric and imperial units (i.e., meters and yards), that discussion does not render the substance of Gonzalez's testimony unreliable or confusing. In substance, Gonzalez presented a Cellebrite phone extraction report. That report is, itself, understandable by a lay juror. The report recites a number of steps taken (or flights climbed) by the holder of the phone during segments of time:

| 26 | Steps and Distance | 1011 Steps 760.27 Meters | Last Launch: 11/8/2020 7 23 55 AM(UTC-6) |
| | | | Start time: 11/8/2020 6 46 06 AM(UTC-6) |
| | | | End time: 11/8/2020 7 11 30 AM(UTC-6) |

By way of the above example, one entry of the Cellebrite phone extraction report on the iHealth data demonstrates Ibanez-Barrera's phone traveled 1011 steps (or 760.27 meters) on November 8, 2020, between 6:46 a.m. and 7:11 a.m. The information presented in the Cellebrite extraction report is readily accessible to a layperson, and itself cannot be considered confusing, notwithstanding Gonzalez's inability to convert meters to yards during questioning. We conclude Gonzalez's testimony regarding the extracted cellphone data was reliable and not confusing to the jury. We overrule Ibanez-Barrera's third issue.

**MOTION TO SUPPRESS**

In his fourth issue, Ibanez-Barrera asserts the trial court erroneously denied his motion to suppress his custodial interrogation. According to Ibanez-Barrera, he did not knowingly,

intelligently, and voluntarily waive his rights because Alvarez failed to explain the waiver of Fifth Amendment rights and commanded Ibanez-Barrera to sign a pre-printed *Miranda* warning without explaining its effect.

### *Standard of Review*

"A trial court's ruling on a motion to suppress is reviewed for abuse of discretion and should be reversed only if it is outside the zone of reasonable disagreement." *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021). "A bifurcated standard applies when we review a trial court's ruling on a motion to suppress based on an alleged *Miranda* violation." *Martinez-Hernandez v. State*, 468 S.W.3d 748, 756 (Tex. App.—San Antonio 2015, no pet.). We first "afford[] almost total deference [to] the trial judge's rulings on questions of historical fact and on application of law to fact questions that turn upon credibility and demeanor," and second, we review "de novo the trial court's rulings on [the] application of law to fact questions that do not turn upon credibility and demeanor." *Id.* (citation omitted). The erroneous denial of a motion to suppress a statement taken in violation of *Miranda* is constitutional error subject to review under the standard in Texas Rule of Appellate Procedure 44.2(a). *See* TEX. R. APP. P. 44.2(a).

### *Error Preservation*

Generally, error is preserved for appellate review if a defendant who files a pretrial motion to suppress secures an adverse ruling on the evidentiary issue he desires to appeal. *Id.* R. 33.1; *Thomas v. State*, 408 S.W.3d 877, 881 (Tex. Crim. App. 2013). However, that same preservation may be waived if the defendant later at trial affirmatively states "no objection" when the evidence is offered and the record, in context, shows the defendant either intended to waive his objection or it is unclear from the record regarding the defendant's intentions. *See Thomas*, 408 S.W.3d at 885–86.

Here, Ibanez-Barrera filed a pretrial motion to suppress his custodial interview, which the trial court denied. This would have preserved this issue for our review. *See* TEX. R. APP. P. 33.1; *Thomas*, 408 S.W.3d at 881. However, when the video and transcript of his custodial interview were offered at trial, Ibanez-Barrera's defense counsel affirmatively stated "no objection" to the entry of the evidence. The record contains no contextual clues that Ibanez-Barrera's defense counsel's "no objection" response was otherwise subject to his earlier motion to suppress the same evidence or that the response was anything other than an intentional waiver of his earlier objection previously preserved through his motion to suppress.

Without deciding the issue of error preservation, we resolve the merits of the suppression issue in the analysis below.

### *Applicable Law*

The State "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1965). Interrogation includes (1) "express questioning" and (2) "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Under Article 38.21 of the Texas Code of Criminal Procedure, an "accused's statement may be used as evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." *Gibbs v. State,* 555 S.W.3d 718, 733 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (quoting TEX. CODE CRIM. PROC. art. 38.21). A defendant's oral statement made as a result of custodial interrogation is inadmissible in a criminal proceeding unless a

recording is made of the statement, the defendant is warned during the recording but before making the statement that any statement he makes may be used as evidence against him in court, and he knowingly, intelligently, and voluntarily waives those rights. *See* TEX. CODE. CRIM. PROC. art. 38.22, §§ 3, 6.

We undertake a two-part inquiry into whether a defendant's waiver is valid. *See Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010); *Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010). First, the waiver must have been "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis*, 560 U.S. at 382 (citation omitted); *Joseph*, 309 S.W.3d at 25. Second, the waiver must have been "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis*, 560 U.S. at 382–83 (citation omitted); *Joseph*, 309 S.W.3d at 25. Courts consider the totality of the circumstances surrounding the interrogation. *Joseph*, 309 S.W.3d at 25.

### *Analysis*

Ibanez-Barrera argues the totality of the circumstances reveals (1) Ibanez-Barrera was arrested for tampering with evidence approximately three hours prior to questioning, (2) Ibanez-Barrera was prevented from leaving during that time, (3) the investigating officer, Alvarez, failed to read the entirety of the pre-printed statements on the waiver of rights portion of the form, and (4) Alvarez instructed Ibanez-Barrera to "just sign here, this just means that I read you your rights, that's all it means, nothing more." According to Ibanez-Barrera, these facts demonstrate he did not waive his rights under *Miranda* or Article 38.22 and, therefore, the trial court abused its discretion in admitting Ibanez-Barrera's statements at trial.

In response, the State argues Alvarez Mirandized Ibanez-Barrera, and Ibanez-Barrera waived his rights verbally, through his conduct, and in writing. The State argues Ibanez-Barrera

volunteered information prior to being questioned about the murder but that Alvarez advised Ibanez-Barrera (in Spanish):

**Alvarez**: All right, Mr. [Ibanez-Barrera] I'm going to read you your rights. . . . Before we do it- let me. Before we ask you any questions you must have the knowled- consent to your rights, you have the right to remain silent, anything you say - you - can be used against you in court, you have the right to consult with a lawyer to make- be advised by - by him before- we ask you questions and you also have the right to the presence of your lawyer during the interrogation, if you do not have the means to employ a lawyer, one will be assigned to you bef - before initiating the questions if you wish, Okay? If you decide to answer questions now without the presence of an attorney, you have every right to terminate the answers at any time if you wish, did you understand?

**Ibanez-Barrera:** Correct.

**Alvarez:** Righ-? I mean you don't have to talk to me, but you can talk and you know what? I don't want to (inaudible).

**Ibanez-Barrera:** No, no (inaudible) I have nothing to hide, well, I do not (inaudible).

**Alvarez:** There you go, I also want to go home.

**Ibanez-Barrera:** Yes, I'm already very tired (inaudible)

**Alvarez:** Yes, just – just sign here, this just means that I read you your rights, that's all it means, nothing more.

**Ibanez-Barrera:** Okay, done.

We agree with the State that Alvarez orally advised Ibanez-Barrera of his rights under *Miranda* and Article 38.22.[3] Although Alvarez did not use the words "waiver of rights" in his oral admonishment, he substantively informed Ibanez-Barrera of waiver by telling him of his right to remain silent and that his statements may be used against him in court. In tone, the discussion was cordial, and there is no indication that Alvarez intended to coerce Ibanez-Barrera into unknowingly

---

[3] Because Ibanez-Barrera's verbal waiver is sufficient, we need not address written waiver. *See* Tex. R. App. P. 47.1.

waiving his rights or that Ibanez-Barrera felt any compulsion to waive his rights. Insisting he had nothing to hide, Ibanez-Barrera waived his rights and implicitly did so through his conduct by continuing the interview after being advised he had the right to terminate the interview at any time if he wished to do so. Considering the totality of the circumstances, we reject Ibanez-Barrera's argument that he did not knowingly, intelligently, and voluntarily waive his rights. We accordingly overrule Ibanez-Barrera's fourth issue.

## CONCLUSION

Having overruled Ibanez-Barrera's issues, the judgment of the trial court is affirmed.

Lori I. Valenzuela, Justice

DO NOT PUBLISH